**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

Nos. 15-1656, 15-1717

_____

THE PNC FINANCIAL SERVICES GROUP, INC.; PNC BANK, N.A.,
individually and as Successor in Interest to National City Bank,
Appellants in No. 15-1656

v.

*HOUSTON CASUALTY COMPANY;
AXIS INSURANCE COMPANY

*(Dismissed Pursuant to Court's Order dated 07/17/2015)

AXIS INSURANCE COMPANY,
Appellant in No. 15-1717

_____

On Appeal from the United States District Court
for the Western District of Pennsylvania
(D.C. Civ. No. 2-13-cv-00331)
District Judge: Honorable Cathy Bissoon

_____

Argued January 29, 2016

_____

Before: VANASKIE, SHWARTZ, and RESTREPO, *Circuit Judges*.

(Opinion Filed: 05/02/2016)

Douglas E. Cameron, Esq.
Courtney C.T. Horrigan, Esq.
James C. Martin, Esq. [ARGUED]
Robert H. Owen, Esq.
Reed Smith LLP
225 Fifth Avenue

Pittsburgh, PA 15222
    *Counsel for Appellants/Cross-Appellees*

Jason P. Cronic, Esq. [ARGUED]
John E. Howell, Esq.
Wiley Rein LLP
1776 K Street N.W.
Washington, DC 20006
    *Counsel for Appellee/Cross-Appellant*

Louis C. Long, Esq.
Thomas, Thomas & Hafer LLP
525 William Penn Place
37th Floor, Suite 3750
Pittsburgh, PA 15219
    *Counsel for Appellee/Cross-Appellant*

————————

OPINION[*]

————————

VANASKIE, *Circuit Judge*.

This appeal concerns whether Appellant PNC Financial Services Group, Inc.

("PNC") is entitled to insurance coverage for amounts it paid to resolve several class

action lawsuits.  Specifically at issue is whether $102 million that PNC paid pursuant to

two settlement agreements is covered under PNC's insurance policy with its excess

insurer, Appellee Axis Insurance Company ("Axis").  On cross motions for judgment on

the pleadings, the District Court concluded that the majority of the settlement payments

were excluded from coverage under the policy's "Professional Services Charge

Exception" because the payments constituted a refund of overdraft fees paid by PNC's

[*] This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

2

customers. The District Court also held, however, that approximately $30 million of the $102 million, which was awarded to class counsel as attorneys' fees and costs, was recoverable under the policy as covered "Damages" that did not fall within the Professional Services Charge Exception. PNC appealed and Axis filed a cross-appeal. For the reasons that follow, we conclude that the entire $102 million is excluded from coverage under the Professional Services Charge Exception. Accordingly, we will affirm in part and reverse in part.

I.

We write primarily for the parties, who are intimately familiar with the facts of this case. Accordingly, we recount only those facts that are pertinent to our resolution of the issues presented.

Six class action lawsuits were filed against PNC and National City Bank[1] regarding the manner in which the banks processed debit card and ATM transactions in order to maximize fees for overdrafts. Four of the actions were consolidated in the United States District Court for the Southern District of Florida as part of a multi-district action (the "*MDL*" action), the fifth was filed in the United States District Court for the District of Columbia (the "*Trombley*" action), and the sixth was filed in the Court of Common Pleas of Allegheny County, Pennsylvania (the "*Henry*" action).

The class actions presented three main contentions. First, the actions asserted that when a customer uses a debit card, the bank is immediately able to determine whether there are sufficient funds in the customer's account to cover the attempted transaction.

---

[1] PNC acquired National City Bank in 2008.

The banks then have the option to accept or decline the transaction and have the technological capability to notify the customer that the transaction will result in an overdraft of funds if they proceed. Rather than notifying the customer or declining the transaction—which the bank did if the pending transaction would exceed a pre-determined tolerance limit for an account—the banks implemented an automated, fee-based overdraft program that processed the transactions and charged its customers overdraft fees. Second, the suits alleged that the banks manipulated the order in which they processed transactions—by processing them in the order of largest to smallest, instead of chronologically—in order to maximize the fees that a customer paid. Finally, the suits contended that the banks failed to adequately disclose to its customers that they could opt out of this policy and avoid overdrafts and fees altogether.

PNC reached agreements to settle the *Trombley* and *MDL* actions in December 2010 and December 2012, respectively. The *Trombley* settlement agreement provided for a fund of $12 million to "refund" overdraft fees incurred over any selected two-month period. (J.A. 693.) The *MDL* settlement agreement provided for a fund of $90 million to reimburse, on a pro rata basis, customers who were charged two or more overdraft fees on the same day and customers who had a "Positive Differential Overdraft Fee."[2] (J.A. 833, 838.)

---

[2] A "Positive Differential Overdraft Fee" is determined by calculating the difference between the amount of overdraft fees PNC charged using high-to-low posting and the amount of overdraft fees PNC would have charged without using this method, less the total amount of refunds the customer already received. If the resulting number is positive, then the customer has a "Positive Differential Overdraft Fee." For example, assume PNC charged a customer ten overdraft fees using high-to-low posting. If the

4

On December 1, 2011, the District Court for the District of Columbia approved the *Trombley* settlement agreement. In approving the settlement, the District Court directed that approximately $3 million of the $12 million fund be paid to class counsel as attorneys' fees and costs. On August 5, 2013, the District Court for the Southern District of Florida approved the *MDL* settlement agreement. In approving the *MDL* settlement, the District Court directed that approximately $27 million of the $90 million settlement fund be paid to class counsel as attorneys' fees and costs. Importantly, the agreements did not provide that PNC would pay a set amount to settle the class claims and separately pay class counsel attorneys' fees and costs once the District Court awarded them.[3] Rather, the approximately $30 million in attorneys' fees and costs was to be paid out of the settlement funds. Thereafter, a stipulation was entered in the *Henry* action that acknowledged that the *MDL* settlement agreements resolved the claims of the class members.

Following the settlements, PNC sought indemnification from its insurers. Under PNC's liability insurance program, the first $25 million was self-insured, followed by a

customer would have only been charged five overdraft fees had PNC not used high-to-low posting and PNC had not previously reimbursed the customer for any of the ten overdraft fees it charged, the customer would have a "Positive Differential Overdraft Fee" value of five (10-5-0=5).

[3] Notably, the agreements did provide for such an arrangement with respect to notice and claims administration costs. In the *Trombley* settlement agreement, the parties agreed that, in addition to the $12 million fund, PNC would pay $1.8 million for notice and claims administration costs, with any costs in excess of the $1.8 million to be paid from the settlement fund. (J.A. 751–52.) In the *MDL* settlement agreement, the parties agreed that, in addition to the $90 million fund, PNC would pay "all costs and fees associated with Class Notice and Settlement Administration." (J.A. 1160.)

5

$25 million liability policy issued by Houston Casualty Company ("HCC"). For claims exceeding the first $50 million, PNC retained a $25 million excess insurance policy issued by Axis.

The policies with both HCC and Axis cover "all **Loss** for which the **Insured** becomes legally obligated to pay on account of any **Claim** first made against the **Insured**." (J.A. 113.) "**Loss**" is defined as "**Claims Expenses** and **Damages**."[4] (J.A. 116.) In turn, "**Damages**" is defined as "a judgment, award, surcharge or settlement . . . and any award of pre- and post-judgment interest, attorneys' fees and costs." (J.A. 115.) There are, however, several exceptions to the general definition of Damages, one of which is that Damages do not include "fees, commissions or charges for **Professional Services** paid or payable to an **Insured**" (referred to herein as the "Professional Services Charge Exception" and referred to in the District Court opinions as the "Fee Exception"). (J.A. 115.) HCC and Axis denied coverage, contending that the settlement payments represented a refund of overdraft fees that customers had previously paid to PNC and National City Bank for Professional Services and, therefore, fell within the Professional Services Charge Exception to Damages.

In light of the insurers' denial of coverage, PNC filed a declaratory judgment and breach of contract action in the United States District Court for the Western District of Pennsylvania. The case was referred to a Magistrate Judge, who addressed the parties' cross motions for judgment on the pleadings. The motions raised two legal issues central

---

[4] The policies define "**Claims Expenses**" as "reasonable legal fees and expenses incurred in the defense or investigation of any **Claim**." (J.A. 114.)

6

to the dispute: (1) whether the amounts sought by PNC constitute "Loss" or "Damages" as defined by the policies; and (2) whether it would be contrary to Pennsylvania public policy to provide coverage for the amounts PNC paid in connection with the settlement agreements.

On May 21, 2014, the Magistrate Judge issued a Report and Recommendation in which she concluded that the settlement payments constituted Damages and Loss under the policies because the Professional Services Charge Exception only applied to first-party losses. According to the Magistrate Judge, interpreting the Professional Services Charge Exception "to apply to third-party claims for improperly assessed fees . . . would render coverage under the financial institution liability policy illusory" and make "superfluous" the policy's Personal Profit Exclusion ("PPE").[5] (J.A. 27.) Additionally, the Magistrate Judge held that it was not contrary to Pennsylvania public policy to provide coverage for the settlement payments. Therefore, the Magistrate Judge found that the $102 million in payments were covered under the terms of the policies.

---

[5] The PPE provides:

> The **Underwriter** shall not be liable to make any payment for **Loss** on account of a **Claim**:
> . . . .
> (C) brought about or contributed to in fact by any:
> . . . .
> (2) profit or remuneration gained by any **Insured** to which such **Insured** is not legally entitled;
> *as determined by a final adjudication in the underlying action*[.]

(J.A. 118 (emphasis added).)

7

The District Court disagreed, concluding that "given the nature of the policy and the language of the **Damages** definition, the exceptions *must* be read to apply to 'third party' losses." (J.A. 36.) Because the settlement payments constituted a refund of fees that customers paid to PNC and National City Bank for Professional Services, the District Court held that "those portions being paid towards the individual class members" were excluded from coverage under the Professional Services Charge Exception. (J.A. 36–37.) The District Court also concluded, however, that the amounts awarded to class counsel for attorneys' fees and costs did not fall within the Professional Services Charge Exception. Instead, the amounts fell within the definition of Damages as an "award of . . . attorneys' fees and costs," (J.A. 115), and were thus covered under the policies. (J.A. 39–40.)

The District Court then directed the parties to file a joint stipulation, consistent with its ruling, in order to determine the total amount of Loss PNC suffered under the policies. Following the District Court's loss determination, PNC timely filed this appeal directed at the District Court's holding that the settlement payments were excluded from coverage under the Professional Services Charge Exception, and the insurers filed a cross-appeal challenging the District Court's holding that the amounts awarded by the Trombley and MDL district courts for attorneys' fees and costs were covered Damages under the policies.[6]

II.

---

[6] HCC and PNC stipulated to the dismissal of PNC's appeal as to HCC and HCC's cross-appeal, leaving Axis as the only remaining Appellee and Cross-Appellant.

8

The District Court had jurisdiction under 28 U.S.C. § 1332(a)(1). We have appellate jurisdiction under 28 U.S.C. § 1291. "We exercise plenary review over the District Court's grant of [a] motion for judgment on the pleadings under Fed. R. Civ. P. 12(c)." *Allstate Prop. & Cas. Ins. Co. v. Squires*, 667 F.3d 388, 390 (3d Cir. 2012). We look to the underlying allegations, as well as to the Settlement Agreements that PNC attached to its own Rule 12(c) motion, to determine whether the *Trombley* and *MDL* Settlement payments fall within or outside of the policy coverage. *See Spruill v. Gillis*, 372 F.3d 218, 223 & n.2 (3d Cir. 2004) (court may consider undisputedly authentic documents upon which the complaint is based that are attached to a Rule 12(c) motion); *Fid. Bank v. Chartis Specialty Ins. Co.*, No. 12-4259, 2013 WL 4039414, at *3 (N.D. Ga. Aug. 7, 2013) (reviewing underlying allegations and concluding that settlement required bank "to return its customers' funds").

## A.

This case involves interpretation of an insurance policy, and the determination of "the existence or non-existence of coverage is generally performed by the court." *Gardner v. State Farm Fire & Cas. Co.*, 544 F.3d 553, 558 (3d Cir. 2008) (quoting *Donegal Mut. Ins. Co. v. Baumhammers*, 938 A.2d 286, 290 (Pa. 2007)).[7] A court's "primary goal in interpreting a policy . . . is to ascertain the parties' intentions as manifested by the policy's terms." *Liberty Mut. Ins. Co. v. Sweeney*, 689 F.3d 288, 293 (3d Cir. 2012) (quoting *Kvaerner Metals Div. of Kvaerner U.S., Inc. v. Commercial*

---

[7] Both parties agree that Pennsylvania law governs the interpretation of the insurance policy at issue.

*Union Ins. Co.,* 908 A.2d 888, 897 (Pa. 2006)). Where "the language of the contract is clear and unambiguous, a court is required to give effect to that language." *Id*. (quoting *Standard Venetian Blind Co. v. Am. Empire Ins. Co.*, 469 A.2d 563, 566 (Pa. 1983)). If a provision of a policy is ambiguous, however, courts generally construe the provision "in favor of the insured and against the insurer, the drafter of the agreement." *Gardner*, 544 F.3d at 558 (quoting *Standard Venetian Blind Co.*, 469 A.2d at 566). *But see E. Associated Coal Corp. v. Aetna Cas. & Sur. Co.*, 632 F.2d 1068, 1075 (3d Cir. 1980) (applying Pennsylvania law) (stating that the principle of construing ambiguous provisions in favor of insured "does not control the situation where large corporations, advised by counsel and having equal bargaining power, are the parties to a negotiated policy."). Although "[t]he burden is on the insured to establish coverage under an insurance policy," the insurer "bears the burden of establishing the applicability of an exclusion . . . [which is] always strictly construed against the insurer and in favor of the insured." *Nationwide Mut. Ins. Co. v. Cosenza*, 258 F.3d 197, 206-07 (3d Cir. 2001) (citing *Erie Ins. Exch. v. Transamerica Ins. Co.*, 533 A.2d 1363, 1366-67 (Pa. 1987)). Exclusions are not read in isolation, however; all of the terms of an insurance policy "must be read together and construed according to the plain meaning of the words involved . . . ." *Estate of Sanchez v. Colonial Penn Ins.*, 532 A.2d 857, 860 (Pa. Super. Ct. 1987); see *Sloan & Co. v. Liberty Mut. Ins. Co.*, No. 07-5325, 2008 WL 3832519, at *2 (E.D. Pa. Aug. 15, 2008) (contractual terms should be "read[ ] in harmony with the rest of the contract").

B.

PNC asserts that the policy at issue here is ambiguous. It posits that there are two interpretations of the Professional Services Charge Exception that are reasonable: (1) the Magistrate Judge's interpretation that the Exception only applies to first-party losses; and (2) PNC's interpretation that the Exception only applies where there has been a "final adjudication" that it was not entitled to the overdraft fees paid by its customers. In light of these two reasonable constructions of the Professional Services Charge Exception, PNC argues, the Exception is ambiguous and should have been construed in favor of coverage. We are unpersuaded and find that neither of these constructions is reasonable.

A contractual provision is ambiguous where "it is reasonably susceptible of different constructions and capable of being understood in more than one sense." *Gardner*, 544 F.3d at 558 (quoting *Hutchison v. Sunbeam Coal Corp.*, 519 A.2d 385, 390 (Pa. 1986)). Courts should not, however, "distort the meaning of the language or resort to a strained contrivance in order to find an ambiguity." *Madison Const. Co. v. Harleysville Mut. Ins. Co.*, 735 A.2d 100, 106 (Pa. 1999); *see also Selko v. Home Ins. Co.*, 139 F.3d 146, 152 n.3 (3d Cir. 1998) (applying Pennsylvania law). "Disagreement between the parties over the proper interpretation of a contract does not necessarily mean that a contract is ambiguous." *Viera v. Life Ins. Co. of N. Am.*, 642 F.3d 407, 419 (3d Cir. 2011) (applying Pennsylvania law) (quoting *12th St. Gym, Inc. v. Gen. Star Indem. Co.*, 93 F.3d 1158, 1160 (3d Cir. 1996)). Moreover, the fact that an insurance policy "has been construed in different ways by the various courts that have considered it" does not mandate that the policy is ambiguous. *Lower Paxton Twp. v. U.S. Fid. & Guar. Co.*, 557 A.2d 393, 400 n.4 (Pa. Super. Ct. 1989).

11

The Magistrate Judge held that the Professional Services Charge Exception only applies to first-party losses because applying it to third-party losses would render the PPE "superfluous" and coverage under the policy "illusory." (J.A. 27.) The PPE, however, is much broader than the Professional Services Charge Exception, as the Professional Services Charge Exception only applies to Damages relating to fees or charges for Professional Services. In contrast, the PPE excludes coverage for Damages and Claims Expenses relating to any profit or remuneration.[8] Therefore, the broader PPE would not be rendered superfluous if the Professional Services Charge Exception were applied to third-party losses. Moreover, coverage under the policy would not be illusory because the policy would still provide coverage for judgments, awards, surcharges, and settlements that do not fall within any of the exceptions to Damages, as well as all Claims

---

[8] The primary differences between the Professional Services Charge Exception and the PPE are as follows: (1) the Professional Services Charge Exception applies where a judgment, award, surcharge, or settlement is reached as a result of a claim regarding fees for professional services, (J.A. 115), while the PPE excludes coverage not only where the claim involves unlawful profits, but where a claim is "brought about or contributed to in fact" by any unlawful gain, (J.A. 118); (2) the Professional Services Charge Exception excludes coverage for damages (but not the other type of loss, claims expenses, which include the insured's own legal fees, *see* (J.A. 51, 114)), while the PPE excludes coverage for loss (which includes both damages and claims expenses); (3) the Professional Services Charge Exception applies narrowly to "fees . . . for Professional Services," regardless of whether PNC is legally entitled to them, (J.A. 115), while the PPE excludes "any . . . profit or remuneration gained by any Insured to which such Insured is not legally entitled," (J.A. 118); and (4) the Professional Services Charge Exception is contained within the damages definition that expressly refers to settlement, (J.A. 115), while the PPE requires a determination that the Insured is not "legally entitled" to such profits or remuneration by a "final adjudication in the underlying action." (J.A. 118.)

12

Expenses where the PPE or another exclusion is not implicated.[9] *See ACE Capital Ltd. v. Morgan Waldon Ins. Mgmt., LLC*, 832 F. Supp. 2d 554, 572 (W.D. Pa. 2011) (applying Pennsylvania law) (holding that an insurance policy is only illusory where it "would not pay benefits under any reasonably expected set of circumstances" and "is not illusory simply because of a potentially wide exclusion" (internal quotations omitted)). Accordingly, applying the Professional Services Charge Exception to third-party losses does not render the PPE superfluous or coverage illusory, and nothing in the policy's language indicates that the parties intended the Professional Services Charge Exception to apply only to first-party losses.

PNC's construction of the Professional Services Charge Exception is equally meritless. PNC construes the Professional Services Charge Exception to apply only when there is a "final adjudication" mandating the return of fees for Professional Services. But this construction is built on the faulty premise that the PPE and the Professional Services Charge Exception "speak to the same subject" and, therefore, the PPE's final adjudication requirement should reasonably apply to the Professional Services Charge Exception as well. (PNC Br. 27.) As explained above, however, the PPE and the Professional Services Charge Exception do not "speak to the same subject" because the PPE is much broader than the Professional Services Charge Exception. If the parties intended a final adjudication requirement for the Professional Services Charge

---

[9] For example, the policy would still provide coverage for Damages resulting from a failure to competently provide Professional Services—such as lawsuits alleging PNC failed to offer proper advice, failed to warn of known consequences, or conducted substandard due diligence.

Exception to apply, they could have expressly stated so, as they did with the PPE. We find that the plain terms of the Professional Services Charge Exception, however, do not require a final adjudication in order for it to apply.[10]

In sum, the Magistrate Judge's and PNC's constructions of the Professional Services Charge Exception are not reasonable. Rather, each construction "distort[s] the meaning of the language or resort[s] to a strained contrivance in order to find an ambiguity." *Madison Const. Co.*, 735 A.2d at 106. Accordingly, we find that the Professional Services Charge Exception is not ambiguous and the District Court did not err by failing to adopt a construction favoring coverage.

C.

PNC next argues that the District Court erred by rewriting the Professional Services Charge Exception. *See Guardian Life Ins. Co. of Am. v. Zerance*, 479 A.2d 949, 953 (Pa. 1984) (holding that a court "may not rewrite the insurance contract, under the guise of judicial interpretation"). PNC contends that the Professional Services Charge

---

[10] We also reject PNC's contention that the failure to apply the PPE's "final adjudication" language to the Professional Services Charge Exception creates an irreconcilable conflict between the Professional Services Charge Exception and the PPE where there is a claim involving charges for Professional Services to which PNC is allegedly not legally entitled. PNC contends that under the District Court's construction, the overdraft fees would qualify as "fees . . . for Professional Services," (J.A. 115), under the Professional Services Charge Exception and as "profit or remuneration . . . to which [PNC] is not legally entitled," (J.A. 118), under the PPE. According to PNC, this creates a conflict between the provisions because one provision requires a final adjudication and one does not. PNC's argument is flawed, however, because the PPE applies to "Loss," which is defined as "Damages and Claims Expenses." Excepted from the definition of Damages are "fees, commissions or charges for Professional Services paid or payable to [PNC]." (J.A. 115.) Therefore, if the Professional Services Charge Exception applies to overdraft fees, they are not Damages and do not fall within the definition of Loss, rendering the PPE inapplicable.

14

Exception as written provides that "**Damages** shall not include . . . fees, commissions, or charges for **Professional Services** paid or payable to an **Insured**," but the District Court rewrote the Professional Services Charge Exception to exclude the "***reimbursement*** or ***refund*** . . . ***to class members*** of fees for Professional Services ***originally*** paid or payable to an Insured." (PNC Br. 37.) According to PNC, it was error for the District Court to read the words "reimbursement or refund" into the Professional Services Charge Exception and to rewrite the phrase "paid or payable to an **Insured**" to specify to whom the fees were originally paid, when the phrase is more reasonably read to specify to whom the Damages at issue are paid.

We reject both of these assertions. First, the District Court did not graft the words "reimbursement" and "refund" onto the Professional Services Charge Exception. It used these words because they are factually accurate descriptions of the settlement payments made by PNC. *See* (J.A. 693 (explaining the process of submitting a claim "[i]n order to receive a *refund* under [the *Trombley* Revised] Settlement Agreement") (emphasis added)); (J.A. 752 ("Pursuant to the [*Trombley*] Revised Settlement Agreement, class members would receive a maximum *reimbursement* of $36 for each eligible overdraft charge[d] . . . .") (emphasis added)); (J.A. 830–33 (agreeing that payments to *MDL* class members would be based upon the number of overdraft fees charged due to high-to-low posting minus any overdraft fees already returned or refunded)). Second, PNC's argument regarding the phrase "paid or payable to an **Insured**" is a variation of the first-party construction we rejected above and is contrary to the plain terms of the policy.

15

Accordingly, we conclude that the District Court did not impermissibly rewrite the Professional Services Charge Exception in construing the policy's coverage.

D.

Finally, PNC argues that even accepting the District Court's interpretation of the Professional Services Charge Exception, the settlement payments are nonetheless covered under the policy because they do not constitute a refund of fees for Professional Services. PNC contends that characterizing the class action lawsuits as disputes solely over overdraft fees is too narrow of a view because the actions extended more broadly to the services PNC provided. Moreover, the class actions sought more than restitution of fees, including compensatory damages, punitive damages, and injunctive relief. The settlement payments were not simply reimbursements, PNC argues, but rather took into account a multitude of factors, such as litigation risk. In rejecting this argument, the District Court explained:

> The Court finds that while the Plaintiffs in both Trombley and the MDL brought several different types of claims, and sought relief in several different forms, the essence of the claims dealt with PNC's policy of charging overdraft fees. Moreover, contrary to PNC's assertion that the settlement constituted "compensatory" relief rather than "restitution," it is clear that both settlement agreements were drafted to reimburse or refund class members with the overdraft fees that the class members had previously paid to PNC. As such, the Court finds that there is no other way for the Court to construe the Fee Exception than to encompass the settlements at issue here.

(J.A. 37 (footnote omitted)).

16

We concur with the District Court's analysis.[11] In both settlement agreements, the class members were defined as those who had incurred overdraft fees that had not been previously refunded. *See* (J.A. 683 (defining *Trombley* class as "persons who . . . incurred at least one Overdraft Fee . . . that was not previously reversed, refunded, or returned to the Settlement Class Member by Defendant")); (J.A. 813 (defining *MDL* class as "[a]ll holders of a PNC Account who . . . incurred one or more Overdraft Fees as a result of PNC's High-to-Low Posting")). Likewise, the payouts to class members were expressly based upon the number of overdraft fees incurred. *See* (J.A. 693 ("A Settlement Class Member shall be eligible to claim compensation for each Overdraft Fee that the Settlement Class Member incurred during any two calendar months during the Class Period.")); (J.A. 830–33 (explaining that the payouts to class members in the *MDL* settlement would be based on the amount of the class members' "Positive Differential Overdraft Fee"—the excess fees charged by using high-to-low posting as opposed to chronological posting.)). Finally, the notice to class members in each settlement explained that payment was based on the amount of overdraft fees charged to each class member. *See* (J.A. 718 ("Payments will be based upon the number of Overdraft Fees . . . .")); (J.A. 1103 ("Any payment you are eligible to receive will be based on the number of overdraft fees charged to your PNC consumer deposit account as a result of posting debit card transactions high to low . . . .")).

---

[11] Additionally, we reject PNC's assertion that this Court cannot decide on this record whether the settlement payments constituted fees. In PNC's motion for judgment on the pleadings, PNC expressly requested that the Court resolve whether the amounts sought by PNC constitute "Loss" or "Damages" as those terms are defined in the policies.

17

Because the Professional Services Charge Exception unambiguously excludes from the definition of Damages third-party losses that constitute fees or charges for Professional Services paid to PNC and National City Bank, and the *MDL* and *Trombley* settlement payments in fact refunded overdraft fees, we conclude, as did the District Court, "that there is no other way for the Court to construe the [Professional Services Charge] Exception than to encompass the settlements at issue here." (J.A. 37.)

E.

We depart, however, from the District Court's conclusion that the approximately $30 million awarded to class counsel as attorneys' fees and costs does not fall within the Professional Services Charge Exception. Rather, we hold that the entire $102 million in settlement funds are excluded from coverage under the Professional Services Charge Exception.

The District Court held that the amount awarded to class counsel for attorneys' fees and costs fell within the definition of Damages, which includes an "award of . . . attorneys' fees and costs." (J.A. 115.) Concluding that the approximately $30 million represented PNC's payment of class counsels' attorneys' fees, and not a refund of fees or charges for Professional Services, the District Court held that it did not fall within the Professional Services Charge Exception to Damages.

The policy covers "Loss" —and thus attorneys' fees—that PNC was "legally obligated to pay." (J.A. 113.) Although the settlement agreements contemplated that some attorneys' fees would likely be paid to class counsel, PNC was not legally obligated to pay those fees under the terms of the settlement agreements. Instead, the settlement

18

agreements expressly provided that any attorneys' fees and costs that were ultimately awarded to class counsel would be paid *by the class out of the settlement funds*. *See* (J.A. 684 ("All attorneys' fees, costs and expenses will be paid from the Settlement Fund.")); (J.A. 846 ("Any award of attorneys' fees, costs, and expenses to Class Counsel shall be payable solely out of the Settlement Fund.")). The District Courts awarded counsel fees pursuant to the "common fund" or "common benefit" doctrine. (J.A. 789–92 (explaining in the *Trombley* action that attorneys' fees will be awarded pursuant to the common fund doctrine)); (J.A. 1178–79 (explaining in the *MDL* action that attorneys' fees will be awarded pursuant to the common benefit doctrine)). Under the common fund or benefit doctrine, "the plaintiff class as a whole rather than the defendant bears the burden of attorney's fees." *Brytus v. Spang & Co.*, 203 F.3d 238, 242 (3d Cir. 2000); *see In re Diet Drugs*, 582 F.3d 524, 540 (3d Cir. 2009) (explaining that a "plaintiff's attorney, whose efforts create, discover, increase, or preserve a fund to which others also have a claim, is entitled to recover from the fund the costs of his litigation, including attorneys' fees" (internal quotation marks omitted)).

Here, PNC did not agree to pay a specific sum to settle the claims related to overdraft fees and additionally pay the attorneys' fees ultimately awarded to class counsel.[12] Instead, PNC and the class plaintiffs agreed that PNC would pay a lump sum to the class in order to settle their claims and that PNC would have no further obligation

---

[12] PNC and class plaintiffs did make such an agreement regarding notice and claims administration costs. *See* (J.A. 751–52, 1160.) Therefore, PNC became legally obligated to pay these sums separate and apart from the payments that refunded overdraft fees.

19

once it paid the lump sum. That some money from each common fund was subsequently paid to counsel upon order of the respective courts does not change the purpose of the funds—to resolve the class members' claims for wrongly collected overdraft fees. Notably, the settlement agreements expressly provided that PNC's obligation remained the same regardless of how much in attorneys' fees, if any, the District Courts eventually awarded. Once the District Courts decided to award counsel fees, the parties agreed that the awarded fees and costs would be paid by "the plaintiff class as a whole rather than the defendant." *See Brytus*, 203 F.3d at 242; see *In re Cendant Corp. Sec. Litig.*, 404 F.3d 173, 187 (3d Cir. 2005) (explaining that a court acts as a "fiduciary" for a class to ensure that an appropriate portion of the class's funds are used to pay counsel).

Therefore, we conclude that the approximately $30 million awarded to class counsel as attorneys' fees and costs do not constitute an award of attorneys' fee and costs that *PNC was legally obligated to pay*. Rather, PNC was legally obligated to pay $102 million to reimburse class members for charged overdraft fees, from which the class plaintiffs—not PNC—paid their attorneys approximately $30 million for their services. Accordingly, the entire $102 million in settlement payments constitutes a refund of fees or charges for Professional Services that class members paid to PNC and National City Bank, and as such, are excluded from coverage pursuant to the Professional Services Charge Exception.

III.

20

For all the foregoing reasons, we will affirm in part and reverse in part the District Court's judgment and remand the case to the District Court for the entry of an appropriate order.