**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

No. 24-1302
_____

TOWERS WATSON & CO., now known as WTW Delaware Holdings, LLC,

      Plaintiff – Appellant,

v.

NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA; FEDERAL INSURANCE COMPANY; TRAVELERS CASUALTY AND SURETY COMPANY OF AMERICA; LIBERTY INSURANCE UNDERWRITERS, INC.; ALLIED WORLD NATIONAL ASSURANCE COMPANY; IRONSHORE INDEMNITY INC.,

      Defendants – Appellees,

and

U. S. SPECIALTY INSURANCE COMPANY,

      Defendant.

_____

Appeal from the United States District Court for the Eastern District of Virginia, at Alexandria.  Anthony John Trenga, Senior District Judge.  (1:20-cv-00810-AJT-JFA)

_____

Argued:  May 6, 2025                                        Decided:  May 28, 2025

_____

Before AGEE, WYNN and RUSHING, Circuit Judges.

_____

Affirmed by published opinion.  Judge Agee wrote the opinion in which Judge Wynn and Judge Rushing joined.

———————————

**ARGUED:** Paul D. Clement, CLEMENT & MURPHY, PLLC, Alexandria, Virginia, for Appellant. Jonathan D. Hacker, O'MELVENY & MYERS LLP, Washington, D.C., for Appellees. **ON BRIEF:** Robin L. Cohen, Orrie A. Levy, Adam S. Ziffer, COHEN ZIFFER FRENCHMAN & MCKENNA LLP, New York, New York; Andrew C. Lawrence, Joseph J. DeMott, CLEMENT & MURPHY, PLLC, Alexandria, Virginia; Marla Diaz, WHITEFORD, TAYLOR & PRESTON, LLP, Falls Church, Virginia, for Appellant. Thomas J. Judge, Jr., Charles Chotvacs, DYKEMA GOSSETT, PLLC, Washington, D.C., for Appellee Travelers Casualty and Surety Company of America. William Leonard Mitchell, II, ECCLESTON & WOLF, PC, Fairfax, Virginia, for Appellees Liberty Insurance Underwriters, Inc. and Ironshore Indemnity Inc. William J. Brennan, KENNEDYS CMK LLP, New York, New York; Edward W. Cameron, Patrick James McDonald, CAMERON MCEVOY, PLLC, Fairfax, Virginia, for Appellee Allied World National Assurance Company. Allen W. Burton, O'MELVENY & MYERS LLP, New York, New York, for Appellee Federal Insurance Company. Arthur Luk, Scott B. Schreiber, ARNOLD & PORTER KAYE SCHOLER LLP, Washington, D.C., for Appellee National Union Fire Insurance Company of Pittsburgh, Pa.

———————————

2

AGEE, Circuit Judge:

This case returns to us following vacatur and remand to the district court. On remand, the district court held that the "bump-up exclusion" in the relevant directors and officers ("D&O") liability insurance policies "unambiguously applie[d]" to Towers Watson & Co.'s settlement with its shareholders. *Towers Watson & Co. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, No. 1:20-cv-810, 2024 WL 993871, at *9 (E.D. Va. Mar. 6, 2024). As a result, it found that Towers Watson was not entitled to indemnity coverage under those policies and granted National Union Fire Insurance Co. of Pittsburgh, Pa.'s ("National Union") motion for summary judgment to that effect.[1,2]

Towers Watson subsequently brought this appeal. In its view, the district court's interpretation of the bump-up exclusion "renders crucial language . . . nugatory and is divorced from ordinary meaning and common sense." Opening Br. 4. In addition, Towers Watson contends that the district court compounded its interpretive error by relying on the "common fund" doctrine to hold that the "$17+ million in court-ordered attorneys' fees" were likewise excluded from coverage by way of the bump-up exclusion. *Id.* For these reasons, it urges reversal of the district court's decision.

---

[1] As will be discussed below, National Union is the primary insurer. There are also several excess insurers, but their policies "follow form" to the primary policy, "meaning that they incorporate the same terms." *Towers Watson & Co. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 67 F.4th 648, 650 (4th Cir. 2023). The district court's conclusion thus applies with equal force to all the policies.

[2] National Union provided defense coverage for the claims against Towers Watson. What is at issue here is indemnification coverage. When we refer to coverage herein, it means indemnification coverage under the various policies.

3

We agree with the district court that the policies' bump-up exclusion precludes coverage for the parties' settlement, including the portion that ultimately went toward attorneys' fees. We therefore affirm the district court's decision in full.

## I.

### A.

For the 2015-16 policy year, National Union insured Towers Watson under a D&O liability policy.[3, 4] Aside from National Union's primary coverage, Towers Watson had six layers of excess coverage from the other appellants-defendants (together with National Union, the "Insurers"). The excess policies largely "follow form" to the primary policy, meaning that they incorporate its terms and conditions. For convenience, we refer to these primary and excess policies collectively as the "Policy."

The Policy provides coverage for the "Loss of any Organization . . . arising from any Securities Claim made against such Organization for any Wrongful Act of such Organization," and the "Loss of an Organization that arises from any [] Claim . . . made

---

[3] We outlined many of the pertinent facts the last time we encountered this case. *See Towers Watson & Co.*, 67 F.4th at 650–52. We borrow much of that factual recitation here.

[4] A D&O policy, also called a management liability policy, provides coverage to "officers and directors of [a] corporation for claims asserted against them for wrongful acts, errors, omissions, or breaches of duty, and also . . . provide[s] indirect coverage to the corporation for reimbursement of any monies expended to indemnify the officers and directors." 9A Steven Plitt et al., Couch on Insurance § 131:30 n.3 (3d ed. 2024) (citation omitted).

against any Insured Person . . . for any Wrongful Act of such Insured Person." J.A. 1406.[5]

"Loss" is a defined term that includes "damages, settlements, judgments," and defense costs. J.A. 1426.

The Policy also includes what is commonly termed a "bump-up" exclusion, which generally bars coverage for losses stemming from judgments or settlements reached in connection with claims that seek an increase—or "bump up"—in the consideration paid for a security. *Towers Watson & Co. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 67 F.4th 648, 650 (4th Cir. 2023). The bump-up exclusion in the Policy provides:

> In the event of a Claim alleging that the price or consideration paid or proposed to be paid for the acquisition or completion of the acquisition of all or substantially all the ownership interest in or assets of an entity is inadequate, Loss with respect to such Claim shall not include any amount of any judgment or settlement representing the amount by which such price or consideration is effectively increased[.]

J.A. 1427.

This appeal turns on the proper interpretation of that provision.

### B.

In 2015, Towers Watson and Willis Group Holdings plc ("Willis"), entered into a "Merger Agreement." *Towers Watson & Co.*, 67 F.4th at 651. That Merger Agreement was

---

[5] The term "Organization" includes the "Named Entity," which is defined as "Towers Watson & Co." J.A. 1401, 1427. An "Insured Person" includes any "Executive" or "Employee" of Towers Watson. J.A. 1426. A "Securities Claim" includes "Claims" alleging the violation of a "federal, state, local or foreign regulation, rule or statute regulating securities" brought against Towers Watson related to a securities interest in Towers Watson, as well as a "Derivative Suit." J.A. 1430. A "Claim" is defined to include "a civil . . . proceeding for monetary, non-monetary or injunctive relief which is commenced by . . . service of a complaint or similar pleading." J.A. 1422.

the first part of a larger, two-phase transaction. For present purposes, only a few high-level details of that transaction are relevant.

The Merger Agreement involved a "reverse triangular merger." To effectuate that arrangement, Willis first created a wholly owned subsidiary called Citadel Merger Sub, Inc., which then merged into Towers Watson, leaving Towers Watson as the surviving entity. All of Towers Watson's shares were then canceled and delisted from the NASDAQ. In exchange for the canceled shares, Towers Watson shareholders received the right to 2.649 shares of Willis stock for each Towers Watson share, along with a special dividend. As a result, the now-former Towers Watson shareholders collectively acquired 49.9% ownership of Willis. The surviving Towers Watson entity then issued *new* shares to Willis, giving it ownership of "the only outstanding shares" of Towers Watson stock. *Id.* In the end, the implemented Merger Agreement resulted in Towers Watson, with all its pre-merger assets, becoming a wholly owned subsidiary of Willis.

On the same day that the above-described merger was consummated, a subsequent, legally distinct merger involving Towers Watson occurred: Towers Watson merged into another wholly owned subsidiary of Willis, WTW Delaware Holdings LLC. Following *that* merger, Towers Watson ceased to exist.

Over the next few years, former Towers Watson shareholders filed separate class actions against various parties involved in the merger, including Towers Watson's former chairman and CEO John Haley. One action was filed in Virginia federal district court and

6

two others were filed and later consolidated in the Delaware Court of Chancery.[6] These actions, which asserted federal securities law claims and Delaware state law claims, respectively, both stemmed from allegations that Haley negotiated the Merger Agreement under an undisclosed conflict of interest: he would receive a compensation package worth up to $165 million if the deal closed. And because of this alleged conflict, Haley purportedly agreed to a below-market valuation of Towers Watson shares to ensure the merger's success.

Both shareholder actions ultimately settled for a total of $90 million—$75 million in the Virginia action and $15 million in the consolidated Delaware action.

C.

While the underlying shareholder actions were still pending, Towers Watson[7] sought coverage under the Policy. The Insurers funded Towers Watson's defense but denied indemnity coverage for any resulting judgment or settlement. According to the Insurers, the Virginia and Delaware actions sought increased consideration for Towers Watson shares, thereby triggering the Policy's bump-up exclusion and obviating their need to provide coverage. In response, Towers Watson filed this declaratory judgment action in

---

[6] Among other defendants, the Delaware action named several members of Towers Watson's former board of directors, including Haley. In the Virginia action, however, the only former Towers Watson director named as a defendant was Haley.

[7] Although Towers Watson's legal existence terminated following the company's merger into WTW Delaware Holdings LLC, we adopt the parties' convention of continuing to refer to Towers Watson as though it maintained its separate existence post-merger.

the Eastern District of Virginia, seeking a declaration that the bump-up exclusion did not foreclose indemnity coverage.

The parties then filed cross-motions for summary judgment. After considering the parties' various arguments, the district court granted summary judgment in favor of Towers Watson on the grounds that the Merger Agreement did not involve an "acquisition" within the meaning of the bump-up exclusion. As such, the court deemed the exclusion inapplicable and held that Towers Watson was entitled to coverage under the Policy. The Insurers promptly appealed that decision, and this Court vacated and remanded on the narrow grounds that the Merger Agreement *did* involve an acquisition within the meaning of the bump-up exclusion. We were careful to clarify, though, that we did "not resolve the ultimate question [of] whether the bump-up exclusion bars indemnity coverage to Towers Watson for the underlying settlements." *Id.* at 657.

On remand, the district court considered Towers Watson's alternative argument for the exclusion's facial inapplicability: "that the underlying settlements don't represent an effective increase in consideration for the original Towers Watson shares." *Id.*; *see Towers Watson & Co.*, 2024 WL 993871, at *4 ("Towers Watson moves for partial summary judgment on the sole ground that the Settlements did not 'effectively increase' the consideration for the merger."). After thoughtfully weighing this argument, the district court rejected it. In its view, the focus of the inquiry was on "the overall result—whether, at the end of the day, the former Towers Watson shareholders were paid additional monies because the amount they received in the merger was inadequate." *Towers Watson & Co.*, 2024 WL 993871, at *8. And according to the district court, that's exactly what happened

8

here: the "allegations of harm were solely predicated on the theory that shareholders got less in the merger than Towers Watson was worth," and so the "real result" of the settlements "was that the shareholders received increased consideration for the merger, which place[d] the Settlements squarely within the [bump-up exclusion's] carve-out from covered 'Loss.'" *Id.*; *see id.* at *9 ("[A]fter giving all the words in the [bump-up exclusion] their reasonable and ordinary meaning, the Court concludes that the Settlements 'represent' amounts that 'effectively increased' the consideration for the merger, such that the [bump-up exclusion] unambiguously applies to the Settlements.").

The district court went on to specify that the bump-up exclusion also excluded from coverage the portion of the settlement that ultimately went toward the shareholders' attorneys' fees. To reach this conclusion, it referenced the common fund doctrine: "[I]n common fund cases such as the underlying [a]ctions, the defendant pays the settlement to and for the benefit of the class, and the class bears the cost of its own litigation expenses." *Id.* at *9. Thus, "[r]egardless of how the additional consideration [wa]s distributed once it [wa]s paid [out], it nevertheless constitute[d] *in toto* an increase in the consideration paid for the merger." *Id.*; *see id.* ("The shareholders sued for, and received by way of the common settlement funds, $90 million. Thus, that amount represents the amount by which consideration was effectively increased.").

Because the district court concluded that the Policy's bump-up exclusion unambiguously applied to the parties' settlement—including the portion that eventually went to the shareholders' attorneys' fees—it granted summary judgment in favor of the

9

Insurers. Towers Watson timely appealed that decision, and this Court has jurisdiction under 28 U.S.C. § 1291.

## II.

We review de novo the district court's summary judgment award, applying the same legal standards as the district court and viewing all facts in the light most favorable to the nonmoving party. *W.C. Eng., Inc. v. Rummel, Klepper & Kahl, LLP*, 934 F.3d 398, 402–03 (4th Cir. 2019) (quoting *Certain Underwriters at Lloyd's, London v. Cohen*, 785 F.3d 886, 889 (4th Cir. 2015)). Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

Virginia law still governs our interpretation of the Policy. *See Towers Watson & Co.*, 67 F.4th at 653. Under Virginia law, "[a]n insurance policy is a contract, and, as in the case of any other contract, the words used are given their ordinary and customary meaning when they are susceptible of such construction." *Hill v. State Farm Mut. Auto. Ins. Co.*, 375 S.E.2d 727, 729 (Va. 1989). If policy language is ambiguous, i.e., susceptible of two or more reasonable meanings, then "any doubt concerning the meaning of the policy language" must be "resolved against the insurer." *Id.* at 730; *Erie Ins. Exch. v. EPC MD 15, LLC*, 822 S.E.2d 351, 355 (Va. 2019). This *contra proferentum* rule applies with particular force when construing policy exclusions, as the insurer bears the burden of proving that an exclusion applies. *See TravCo Ins. Co. v. Ward*, 736 S.E.2d 321, 325 (Va. 2012) ("Language in a policy purporting to exclude certain events from coverage will be

construed most[] strongly against the insurer." (quoting *PBM Nutritionals, LLC v. Lexington Ins. Co.*, 724 S.E.2d 707, 713 (Va. 2012))).

That said, the Supreme Court of Virginia has "caution[ed]" courts to "resist[]" the "temptation" to "give up quickly on the search for a plain meaning by resorting to the truism that a great many words—viewed in isolation—have alternative, and sometimes quite different, dictionary meanings." *Erie Ins. Exch.*, 822 S.E.2d at 355. Otherwise, "the *contra proferentem* thumb-on-the-scale would apply to nearly every interpretation of nearly every insurance policy." *Id.* Policy language is therefore ambiguous only where the "competing interpretations . . . are 'equally possible' given the text and context of the disputed provision." *Id.* at 356 (quoting *Appalachian Reg'l Healthcare v. Cunningham*, 806 S.E.2d 380, 386 n.10 (Va. 2017)). In other words, the mere fact that the parties disagree on the meaning of the terms of a provision does not necessarily render those terms ambiguous. *TM Delmarva Power, L.L.C. v. NCP of Va., L.L.C.*, 557 S.E.2d 199, 200 (Va. 2002).

## III.

With the above principles in mind, we turn to the primary issue on appeal: whether the "amount of . . . [the] settlement[s]" in the underlying litigation "represent[s] the amount by which [the] price or consideration" paid for the merger was "effectively increased." J.A. 1427. If the amount of the settlements *does* represent such an increase, the Policy's bump-up exclusion is triggered, and the Insurers have no obligation to indemnify Towers Watson for those settlements. But if it does not, all agree that the Insurers would be obligated to

11

indemnify Towers Watson. In the end, we agree with the district court that the settlements *do* fall within the Policy's bump-up exclusion, thus barring indemnity.

Our analysis begins with the language of the bump-up exclusion:

In the event of a Claim alleging that the price or consideration paid or proposed to be paid for the acquisition or completion of the acquisition of all or substantially all the ownership interest in or assets of an entity is inadequate, Loss with respect to such Claim shall not include any amount of any judgment or settlement representing the amount by which such price or consideration is effectively increased[.]

J.A. 1427. By its terms, this provision establishes two conditions that must be satisfied before the exclusion is triggered. First, there must be a "Claim" alleging that the consideration paid for an acquisition was inadequate. *Id.* And second, the settlement of such claim must "represent[]" an "effective[] increase[]" in the "price or consideration" shareholders received for that acquisition. *Id.*

Beginning with the first condition, there is no real dispute that the shareholders filed a "Claim" alleging that the consideration paid for Willis' acquisition of Towers Watson was inadequate. *See, e.g.*, Opening Br. 32–33 (acknowledging that the first element "look[s] only to the allegations of the complaint," and that the Court can therefore "take the first condition as a given"); Response Br. 26 (noting that Towers Watson "no longer disput[es] that both [the Virginia and Delaware actions] were predicated fundamentally on [Towers Watson's] alleged failure to secure adequate consideration for the shares shareholders were forced to relinquish in the transaction"). The first condition is therefore clearly satisfied.

12

The second condition presents a more difficult question. In particular, the parties spar over the meaning and import of the terms "represent" and "*effectively* increase[.]" J.A. 1427 (emphasis added).[8] Since the Policy does not define either term, we look to their dictionary definitions for interpretive guidance. *Towers Watson*, 67 F.4th at 653–54 (acknowledging Virginia courts' "established practice of looking to [an undefined contractual] term's dictionary definition" to ascertain its "ordinary and accepted meaning" (quoting *Lower Chesapeake Assocs. v. Valley Forge Ins. Co.*, 532 S.E.2d 325, 330 (Va. 2000))). For its part, "represent" is defined as "to constitute or amount to," or "[t]o symbolize or stand in place of." *Represent*, Black's Law Dictionary (12th ed. 2024); *see Represent*, Merriam-Webster's Dictionary (last accessed May 12, 2025) https://www.merriam-webster.com/dictionary/represent [https://perma.cc/CL2H-QF8L] (defining "represent" as "to serve as a sign or symbol of"). And "effectively" is defined as "in effect[,] virtually," *Effectively*, Merriam-Webster's Dictionary (last accessed May 12, 2025) https://www.merriam-webster.com/dictionary/effectively [https://perma.cc/U9S3-FDLZ], "the real result of a situation," *Effectively*, Cambridge English Dictionary (last accessed May 12, 2025) https://dictionary.cambridge.org/us/dictionary/english/effectively [https://perma.cc/73XT-2P2Y], and "having [] a certain result in reality, though not in theory," *id.*

_____

[8] To be clear, the parties' dispute over the latter term focuses primarily on the meaning of "effectively." We thus focus our inquiry there too.

13

With these definitions in hand, we have little trouble concluding that the bump-up exclusion's second condition is satisfied. That's because the terms "represent[]" and "effectively increase[,]" particularly when read together, indicate that we must look to the "*real* result of [the] situation," not the theoretical one. *See Effectively*, Cambridge English Dictionary, *supra* (emphasis added); *Represent*, Black's Law Dictionary, *supra*. And if the "real result" of the settlements is that the shareholders receive additional consideration for their relinquished shares, this condition is satisfied. As the district court observed, that's exactly what happened here. The shareholders, claiming their shares were devalued in the merger process because of Haley's conflict of interest, sued Towers Watson. Their lawsuit sought to rectify that perceived shortfall. That is, they sought what was effectively an increase (or "bump-up") in the consideration paid for their shares. The settlements they eventually received constituted—i.e., "represent[ed]"—precisely such a bump-up. J.A. 1427; *see, e.g.*, J.A. 1687 (analysis from the Virginia plaintiffs' damages expert "estimat[ing] damages as the minimum incremental amount that Towers [Watson] shareholders should have expected to obtain or retain based on a full disclosure of the information that Lead Plaintiff argues should have been disclosed").

Because both requirements are met, the bump-up exclusion applies and Towers Watson is not entitled to indemnification for the settlements. Towers Watson's arguments to the contrary are unavailing.

For instance, Towers Watson argues that the district court's analysis of the bump-up clause collapsed its two distinct elements into one by looking only at the allegations and not what the settlement itself represented. This argument is doubly flawed. First, that's not

14

what the district court did. Its opinion was crystal clear on this point and even included separate sections addressing these distinct issues. *See Towers Watson & Co.*, 2024 WL 993871, at *4 ("The Underlying Actions *Alleged* Inadequate Consideration." (emphasis added)); *id.* at *6 ("The Settlements *Represent* an Effective Increase in Consideration." (emphasis added)); *see also id.* at *4–6 (allegations analysis); *id.* at *7–9 (representation analysis). Second, the Court is entitled to review the full record on appeal and independently assess this issue regardless of how the district court reached its conclusion. *See Scott v. United States*, 382 F.3d 132, 137 (4th Cir. 2003) ("We are, of course, entitled to affirm on any ground appearing in the record . . . ."). And for the reasons outlined herein, our independent assessment likewise supports affirmance.[9]

Towers Watson also contends that settlements of alleged violations of § 14(a) of the Securities Exchange Act are categorically immune from the application of bump-up provisions. In its view, that statute governs inadequate disclosures, not inadequate consideration. So, the argument goes, the settlement of a § 14(a) action can never represent an effective increase in deal consideration. While a clever argument, it is beside the point.

---

[9] Relatedly, interpreting the bump-up exclusion in such a way does not render the Policy coverage illusory. As Insurers note, the exclusion does not impact the Policy's coverage for the costs of *defending* against securities claims alleging inadequate consideration. Indeed, Insurers have already paid out millions in covered defense costs here. Moreover, to argue that the exclusion renders the Policy's coverage illusory is to suggest that *all* securities claims involve allegations of inadequate consideration in corporate acquisitions. But as Insurers note, most securities claims *do not* arise out of corporate acquisitions and therefore do not implicate bump-up exclusions.

As the Seventh Circuit acknowledged in *Komatsu Mining Corporation v. Columbia Casualty Company*—a case cited repeatedly by Towers Watson—it is perhaps "doubtful" whether the underlying § 14(a) complaints here "stated good federal claims." 58 F.4th 305, 307 (7th Cir. 2023); *cf. Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 479–80 (1977) (holding that federal securities laws cannot be used to contend that a corporate transaction did not fetch the best price; the federal regulation at issue is instead limited to disclosures). But that has no relevance to the issue at hand. Put simply, we are not presently tasked with deciding "whether or not the complaints came within § 14." *Komatsu*, 58 F.4th at 307. The reason for that is obvious: the parties have already settled the underlying claims, so we need not determine what statutory or common law rights may have been violated. Rather, the only question that remains is "whether the [$90] million is a loss covered by insurance," or if it instead falls within the scope of the bump-up exclusion. *Id.*; *see id.* at 308 (holding that a bump-up clause precluded coverage for the settlement of shareholder lawsuits asserting "inadequate disclosure" claims under § 14(a) of the Securities Exchange Act where the alleged "loss from any legal wrong depended on a conclusion that the price offered in the merger was too low"). And as discussed above, the parties' settlement does in fact "represent[]" an "effective[] increase[]" in deal consideration, such that it falls within the terms of the exclusion.[10] J.A. 1427.

---

[10] Towers Watson also cites a Delaware state trial court case—*Harman International Industries Incorporated v. Illinois National Insurance Company*—in further support of its argument on this point. No. N22C-05-098 PRW CCLD, 2025 WL 84702 (Del. Super. Ct. Jan. 7, 2025). That case, like this one, concerned the settlement of a § 14(a) action. *See id.* at *2–5. And there, the court held that such a settlement could not "be (Continued)

Towers Watson also raises an argument related to the measure of damages. It argues that the lead plaintiff's theory of damages explicitly assumed that no deal would have occurred. And under such circumstances, its shareholders would not have received *any* deal consideration. So, in Towers Watson's view, the damages here are merely meant to remedy the devaluation of its shareholders' stocks, not represent an increase in their compensation for the deal. Once again, though, Towers Watson misses the mark. At bottom, both approaches taken by the shareholders' expert were "designed to identify the shareholders' . . . loss, i.e., the 'true' value of their shares, minus the actual consideration they received." Response Br. 28 (citing J.A. 315, 1687–88). In other words—the difference between what adequate consideration for their shares would have been, and the consideration that they actually received. To argue otherwise is to ignore the shareholders' allegations, the purpose of the expert report, and most importantly, the practical effect of the damages: to compensate shareholders for the purportedly inadequate consideration they received for the acquisition of their shares.[11]

---

deemed to be comprised in any part of a sum reflecting an increase in deal price or consideration" because "[a] cured inadequate deal price isn't the remedy for Section 14(a) . . . claims." *Id.* at *8, *10. Towers Watson asks us to make the same finding here. We decline to do so.

Succinctly, we find *Komatsu* to have the better reasoning on this issue. As the *Komatsu* Court observed, the question before us is no longer whether the underlying complaints stated good § 14(a) claims or sought valid § 14(a) remedies. *See Komatsu*, 58 F.4th at 307. Instead, we are tasked only with determining whether resulting settlements are "loss[es] covered by insurance." *Id.* And for the reasons articulated above, we conclude they are not. Whatever value *Harman* may have in its sphere, it is a nonprecedential state trial court case with different parties and different facts.

[11] One additional note. Towers Watson is correct that the damages calculated by the shareholders' expert *could* also quantify a stock-drop loss. But as Insurers observe, "such (Continued)

17

In sum, the amount of the settlements here "represent[s]" an "effective[] increase[]" in the consideration that shareholders received "for the acquisition" of their shares. J.A. 1427. The settlements therefore fall within the text of the bump-up exclusion, which means that Towers Watson is not entitled to indemnification under the Policy. The district court did not err in reaching that conclusion.

IV.

Towers Watson raises a second issue regarding the district court's resolution of the attorneys' fee question under the common fund doctrine. The district court found that the $17+ million in settlement money that went toward attorneys' fees fell within the ambit of the bump-up exclusion by way of that doctrine. This finding led the district court to conclude that indemnity was barred for the *whole* of the settlements reached, not just the portion that "actually reache[d] the shareholders." *Towers Watson & Co.*, 2024 WL 993871, at *9. We discern no legal error in this conclusion and therefore affirm.

The common fund doctrine derives from principles of equity and "allows a court to award 'a reasonable attorney's fee' to 'a litigant or a lawyer who recovers a common fund for the benefit of persons other than himself or his client . . . from the fund as a whole.'" *Brundle ex rel. Constellis Emp. Stock Ownership Plan v. Wilmington Tr., N.A.*, 919 F.3d

---

an estimate would have served no purpose" here. Response Br. 38. The shareholders never alleged a stock-drop loss, and with good reason–they relinquished their shares as part of the acquisition and never sought "a return of the shares plus additional lost value." *Id.* Instead, they sought compensation to remedy the alleged underpayment they received for their shares. Such a remedy plainly falls within the text of the bump-up exclusion.

18

763, 785 (4th Cir. 2019) (quoting *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980)). A common fund recovery thus "places the plaintiffs' cost of litigation on the recovering beneficiaries of a lawsuit." *Id.* at 786.

The district court invoked this doctrine to conclude that the full $90 million settlement fund—$17,626,730.78 of which ultimately went toward attorneys' fees— "represents the amount by which consideration was effectively increased." *Towers Watson & Co.*, 2024 WL 993871, at *9. It did not err in doing so. In short, the district court rightly observed that, "[r]egardless of how the additional consideration [wa]s distributed once [] paid to the beneficiaries, it nevertheless constitutes *in toto* an increase in the consideration paid for the merger." *Id.* The mechanics of the settlements confirm this point.

As Insurers note, Towers Watson did not directly pay the shareholders' attorneys. Instead, the settlements required Willis to pay $90 million into a common fund entirely for the benefit of Towers Watson shareholders. *See, e.g.*, J.A. 1178 ("The parties . . . have reached proposed Settlements . . . which total $90 million in cash: $75 million for the settlement of the [Virginia] [a]ction and $15 million for the settlement of the Delaware [a]ction."); J.A. 1180 (relying on the $90 million figure to estimate the "average recovery (*before the deduction of any Court-approved fees, expenses, and costs* as described herein) for persons and entities that are members of both [classes]" to be "$1.52 per share" (emphasis added)). The shareholders' authorized class representative then asked the courts to award attorneys' fees and costs *out of that common fund*. *See, e.g.*, J.A. 1180 (noting that, "[b]efore final approval of the Settlements, Class Counsel [would] apply separately to the Courts for awards of attorneys' fees" to be taken *out* of the total $90 million figure);

19

J.A. 1991–93 (court order granting an award of attorneys' fees to be taken as a percentage of the settlement fund). In other words, the shareholders were entitled to the full $90 million, so that *entire amount* represents an effective increase in the consideration they were paid for the merger. That they ultimately placed enough value on their attorneys' contributions to transfer to them a portion of that sum simply has no bearing on the analysis. *Cf. PNC Fin. Servs. Grp., Inc. v. Houston Cas. Co.*, 647 F. App'x 112, 122 (3d Cir. 2016) ("That some money from each common fund was subsequently paid to counsel upon order of the respective courts does not change the [ultimate] purpose of the funds—to resolve the class members' claims for wrongly collected overdraft fees.").

A final point helps to illustrate the problem with Towers Watson's preferred approach of carving out attorneys' fees from the bump-up exclusion's reach. As noted, the settlement itself did not specifically allocate a portion of the settlement fund for attorneys' fees. True, it set *some* parameters. *See, e.g.*, J.A. 1180 (specifying that Class Counsel's attorneys' fees request would "not [] exceed 25% of the respective Settlement Funds"). But discretion was ultimately left to the shareholders, class counsel, and the district court to determine whether those requested fees—which, again, would come out of the fund that the shareholders were otherwise entitled to—were reasonable. *See, e.g.*, *id.*; J.A. 1991–93 (court order analyzing and affirming the reasonableness of the requested fee award). In view of the discretionary and open-ended nature of that decision, it was not error for the district court to conclude that the entire settlement "represent[ed]" an "effective[]

20

increase[]" in the consideration that shareholders received for the acquisition of their shares.[12]

In sum, the logistics of the settlement and attorneys' fees arrangement here confirm that the common fund doctrine is applicable. We therefore affirm the district court's decision to rely on that doctrine in concluding that the bump-up exclusion bars indemnity for the entirety of the settlement awards, including the portion of which that ultimately went toward attorneys' fees.


V.

For the foregoing reasons, the district court's judgment is


*AFFIRMED.*

---

[12] It's also worth noting that, while the shareholders' eventual compensation was not *technically* increased by the amount they paid their attorneys, they were only able to afford those attorneys by way of the settlement award. That is, they received the *value* of the award regardless of whether it was in the form of (a) money they received or (b) services they paid for via the settlement fund. So in a more literal sense, their compensation *was* increased by the amount they paid in attorneys' fees.