IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| ILLINOIS NATIONAL INSURANCE COMPANY and FEDERAL INSURANCE COMPANY, | § § § § | No. 47, 2025 |
| Defendants-Below, Appellants, | § § | Court Below: Superior Court of the State of Delaware |
| v. | § § | |
| HARMAN INTERNATIONAL INDUSTRIES, INCORPORATED, | § § § | C.A. No. N22C-05-098 |
| Plaintiff-Below, Appellee. | § § | |

Submitted: November 5, 2025
Decided: January 27, 2026

Before **SEITZ**, Chief Justice; **VALIHURA**, **TRAYNOR**, **LEGROW**, and **GRIFFITHS**, Justices, constituting the Court *en Banc*.

Upon appeal from the Superior Court. **AFFIRMED**.

Kurt M. Heyman, Esq., Aaron M. Nelson, Esquire, Brendan Patrick McDonnell, Esquire, HEYMAN ENERIO GATTUSO & HIRZEL LLP, Wilmington, Delaware *for Defendants-Below/Appellants Illinois National Insurance Company*.

Robert J. Katzenstein, Esquire, Julie M. O'Dell, Esquire, SMITH, KATZENSTEIN & JENKINS LLP, Wilmington, Delaware *for Defendants-Below/Appellants Federal Insurance Company*.

Jennifer C. Wasson, Esquire, Carla M. Jones, Esquire, POTTER ANDERSON & CORRON LLP, Wilmington, Delaware. *Of Counsel*: Robin L. Cohen, Esquire, Orrie A. Levy, Esquire, Maria Brinkmann, Esquire, COHEN ZIFFER FRENCHMAN & MCKENNA LLP, New York, NY, Paul D. Clement, Esquire, Andrew C. Lawrence, Esquire, Joseph J. DeMott, CLEMENT & MURPHY, PLLC, Alexandria, Virginia *for Plaintiff-Below, Appellee Harman International Industries, Incorporated*.

**VALIHURA**, Justice, for the Majority:

*INTRODUCTION*

This insurance coverage action involves a dispute between Harman International Industries, Inc. ("Harman") and three of Harman's insurers: Illinois National Insurance Company ("AIG"), Federal Insurance Company ("Chubb"), and Berkley Insurance Company ("Berkley" and together with AIG and Chubb, "Insurers"). In 2017, Harman was acquired by Samsung Electronics Co., Ltd. ("Samsung") and in response to the acquisition (the "Transaction"),[1] a class of former Harman shareholders brought a lawsuit alleging that the disclosures made in connection with the transaction violated federal securities laws. After the lawsuit settled, Harman sought coverage from Insurers for the $28 million paid in settlement (the "Settlement Amount"). Insurers denied coverage of the Settlement Amount asserting that a bump-up provision in each insurance policy (collectively, the "Bump-Up Provision") excluded the Settlement Amount from coverage.

The Bump-Up Provision excludes coverage of settlement amounts which would otherwise be covered by the Policy where the claim underlying the settlement alleged inadequate deal consideration for an acquisition and such settlement amount represented an effective increase in deal consideration. This case presents two questions. First, did this federal securities law claim alleging that disclosures were inadequate allege inadequate consideration? And second, did this Settlement Amount, or any portion of this Settlement Amount, represent an increase in deal consideration even though (1) the settlement class included shareholders who did not hold stock at the time of the

---

[1] The Transaction is sometimes referred to herein as the "Acquisition" or the "Merger."

Transaction and, therefore, did not receive deal consideration and (2) no party presented any evidence concerning the "true value" of the shares?

The Superior Court held that neither requirement was met so the Bump-Up Provision did not exclude coverage of the Settlement Amount. Although we disagree with the Superior Court's determination that the first requirement of the Bump-Up Provision was not met, we agree that Insurers did not satisfy the second requirement. Because the Bump-Up Provision requires satisfaction of both requirements, we **AFFIRM** the Superior Court's judgment that the Bump-Up Provision does not exclude coverage of this Settlement Amount.

## I.    *FACTUAL BACKGROUND AND PROCEDURAL HISTORY*

### A.    D&O Insurance

Harman purchased Directors and Officers ("D&O") insurance from Insurers covering the period from January 29, 2016, to January 29, 2017 (the "Policy").[2] The Policy, consisting of a primary policy (the "AIG Policy"), first excess policy (the "Chubb Policy"), and second excess policy (the "Berkley Policy"), provides for a total of $40 million in D&O coverage.[3] The AIG Policy, Chubb Policy, and Berkley Policy all operate identically as applicable to this action, and the Chubb Policy and Berkley Policy both follow form to the relevant provisions of the AIG Policy included below.[4]

---

[2] App. to Appellants' Opening Br. at A69, 76 [hereinafter "A__"] (Del. Sup. Ct. Compl. at 1, 8).

[3] A69–70, 76 (Del. Sup. Ct. Compl. at 1–2, 8). The full program of management liability insurance "provides $125 million in coverage[.]" A76 (Del. Sup. Ct. Compl. at 8).

[4] A76 (Del. Sup. Ct. Compl. at 8).

3

The Policy provides coverage for (1) the **Loss**[5] of any **Insured Person**[6] "that arises from any: [] **Claim** (including any **Insured Person Investigation**) made against such **Insured Person** (including any **Outside Entity Executive**) for any **Wrongful Act** of such **Insured Person**[]" and (2) the "**Loss** of any **Organization**: []arising from any **Securities Claim** made against such **Organization** for any **Wrongful Act** of such **Organization**[.]"[7]  A **Claim** is "a written demand for monetary, non-monetary or injunctive relief[.]"[8]  A **Securities Claim** is a specific type of Claim which alleges a violation of a federal statute regulating securities arising out of the purchase or sale of the securities of an **Organization**.[9]  An **Organization** includes Harman as the **Named Entity**.[10]

The Policy's definition of "**Loss**," which otherwise includes settlements, contains a Bump-Up Provision which excludes a specific type of Loss with respect to a specific type of Claim.[11]  The provision states:

> In the event of a **Claim** alleging that the price or consideration paid or proposed to be paid for the acquisition or completion of the acquisition of all or substantially all the ownership interest in or assets of an entity is inadequate, **Loss** with respect to such **Claim** shall not include any amount of any judgment or settlement representing the amount by which such price

---

[5] Bolded terms shall have the meaning ascribed to them in the Policy, where they are defined. *See* A903 (AIG Policy at 17).

[6] *See* A908 (AIG Policy § 13, at 21) (**Insured Person** "means any: (1) **Executive** of an **Organization**; (2) **Employee** of an **Organization**; or (3) **Outside Entity Executive**.").

[7] A886 (AIG Policy §§ 1.A., 1.C.).

[8] A903 (AIG Policy § 13, at 17).

[9] A912 (AIG Policy § 13, at 25).

[10] A909 (AIG Policy § 13, at 22); A882 (AIG Policy at 1).

[11] A908–09 (AIG Policy § 13, at 21, 22).

4

or consideration is effectively increased; provided, however, that this paragraph shall not apply to **Defense Costs** or to any **Non-Indemnifiable Loss** in connection therewith.[12]

In other words, the Bump-Up Provision excludes coverage of settlement amounts which would otherwise be covered by the Policy where (1) the Claim underlying the settlement alleged inadequate deal consideration for an acquisition and (2) such settlement amount represented an effective increase in deal consideration.

## B. The Transaction

On November 14, 2016, Samsung announced its proposed acquisition of Harman, structured as a reverse triangular merger (*i.e.*, the Transaction).[13] Proxy materials describing the Transaction were disseminated to Harman shareholders in January of 2017.[14] On February 17, 2017, Harman shareholders voted to approve the Transaction, under which each share of outstanding Harman stock, with certain exceptions (*i.e.*, dissenting shares), would be converted into the right to receive $112.00 in cash.[15] Harman and Samsung completed the Transaction on March 10, 2017.[16]

---

[12] *Id.* **Non-Indemnifiable Loss** is **Loss** for which an **Organization** cannot indemnify an **Insured Person** pursuant to applicable contracts and law. *Id.*

[13] A2809 (Samsung Press Release at 1); A2820 (February 2024 Stipulation of Facts ¶ 3).

[14] A563 (Operative Compl. ¶ 5).

[15] A566 (Operative Compl. ¶ 13); A2830 (Agreement and Plan of Merger § 2.01(c)).

[16] A2820 (February 2024 Stipulation of Facts ¶ 2).

## C.     The *Baum* Action and Settlement

### 1.     *Underlying Claims*

On July 12, 2017, Patricia B. Baum (the "Investor") filed an amended class action complaint (the "Operative Complaint")[17] in the United States District Court for the District of Connecticut (the "District Court") against Harman and the Board[18] (together, with Harman, "Defendants"), on behalf of herself and all persons similarly situated (the "Investor Class" and, together with Defendants, the "Underlying Parties").[19] The Operative Complaint alleged that Defendants disseminated a false and misleading proxy statement (the "Proxy") in violation of §§14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§78n(a) and 78t(a), and SEC Rule 14a-9, 17 CFR § 240.14a-9, promulgated thereunder, to induce Harman shareholders to vote in favor of the Transaction.[20]

The Operative Complaint alleged that the Proxy was misleading because, among other things, it "failed to disclose that its 'Management Projections'—which supported the Board's recommendation regarding the intrinsic value of Harman—rested on an unreliable premise that the Company would immediately discontinue its longstanding and

---

[17] The Operative Complaint is sometimes referred to herein as the "*Baum* Action."

[18] The Board members, omitted from the text above for the sake of brevity, are Dinesh C. Paliwal ("Paliwal"), Adriane M. Brown, John W. Diercksen, Ann M. Korologos, Robert Nail, Abraham N. Reichental, Kenneth M. Reiss, Hellene S. Runtagh, Frank S. Sklarsky, and Gary G. Steel. A562, 568–569 (Operative Compl. ¶¶ 2, 23–33).

[19] A562 (Operative Compl. at 1).

[20] A562 (Operative Compl. at 1). The initial complaint, filed on February 15, 2017 (the "Initial Complaint"), included both state fiduciary duty claims and federal securities law claims. *See* A526 (Initial Compl. at 1). However, the Operative Complaint retained only the federal securities law claims. *See* A561 (Operative Compl. at 1).

valuable bolt-on acquisition growth strategy[]" and "contained greater downside risk than upside potential[.]"[21] The Operative Complaint also alleged that the Board "concealed the fact that the Proxy Management Projections contained in the proxy did not include a keystone component of the Company's operative reality and standalone business strategy and presented a misleading narrative regarding the disclosed projections."[22]

The Operative Complaint alleged that, as a result of the inadequate disclosures in the Proxy, the members of the Investor Class were deprived of their right to a fully informed shareholder vote in connection with the Transaction and the full and fair value for their respective Harman shares.[23] The relief sought included "compensatory and/or rescissory damages" equaling "the difference between the price Harman shareholders received and Harman's true value at the time of the Acquisition [] in an amount to be determined at trial."[24]

### 2. The Settlement

After attending a court-recommended mediation, the Underlying Parties agreed to a $28 million Settlement Amount and filed a Stipulation of Settlement (the "Settlement") on June 23, 2022 seeking the District Court's approval.[25] The Settlement stated that (1) the Settlement was a final and complete resolution of all disputes between the Underlying

---

[21] A588, 590 (Operative Compl. ¶¶ 64, 70).

[22] A593 (Operative Compl. ¶ 75). The Operative Complaint alleges that Paliwal was motivated to reduce the valuations to protect "his lucrative side deals with Samsung." A590 (Operative Compl. ¶ 70).

[23] A608–609 (Operative Compl. ¶ 120).

[24] A609, 611 (Operative Compl. at 48, 50).

[25] A705, 707, 714 (Stipulation of Settlement at 1, 3, 10).

Parties with respect to the claims alleged in the Operative Complaint, (2) Defendants continued to deny liability, and (3) the Underlying Parties' decision to settle was based on avoiding the costs, uncertainty, and risks inherent in the litigation.[26] The Settlement also defined the class for the purposes of the Settlement as "all Persons who purchased, sold, or held Harman common stock at any time during the period from and including January 10, 2017, the record date, through and including March 12, 2017, the date the Merger closed."[27]

The Notice of Pendency and Proposed Settlement of Class Action (the "Notice to Shareholders") described the lawsuit as concerning alleged violations of securities laws and notified the settlement class members that "[i]n exchange for the Settlement and the release of the Released Claims [] as well as dismissal of the Litigation, Defendants have agreed that a payment of $28 million will be made by Defendants (or on their behalf) to be divided, after taxes, fees, and expenses, among all Authorized Claimants."[28] The District Court granted final approval of the Settlement on November 10, 2022.[29]

### 3. *Denial of Insurance Coverage*

On July 20, 2017, AIG issued a coverage letter stating that AIG would accept, and provide coverage for, the litigation arising out of the Operative Complaint as a

---

[26] A708–709 (Stipulation of Settlement at 4–5).

[27] A710 (Stipulation of Settlement at 6).

[28] A756, 761 (Notice to S'holders at 4, 9). However, the notice did not explicitly state what the Settlement Amount represents. *See* A761–762 (Notice to S'holders at 9–10).

[29] A2690 (Final J. & Order of Dismissal with Prejudice).

"Securities Claim subject to a reservation of rights."[30]  However, in December 2021 prior to the court-recommended mediation, AIG issued a supplemental coverage letter stating that, based on the Bump-Up Provision included in the Policy's definition of **Loss**, the **Relief** being sought in the Operative Complaint is excluded from the Policy's **Loss** coverage.[31]  "Chubb and Berkley adopted AIG's coverage position."[32]

### D.    Proceedings Below

On May 16, 2022, Harman initiated this action (1) alleging that Insurers breached the Policy by wrongfully excluding the Settlement Amount from coverage and (2) arguing that the Bump-Up Provision does not exclude coverage of the Settlement Amount.[33]  The Superior Court "denied both Insurers' motion to dismiss and Harman's earlier request for summary judgment because the record as-then developed didn't provide sufficient facts to make any determinations in favor of either party."[34]  After discovery, both Harman and Insurers cross-moved for summary judgment based on conflicting interpretations of the Bump-Up Provision.[35]

---

[30] A2186 (AIG's July 20, 2017, Coverage Position Letter at 1).

[31] A3541–42 (AIG's December 13, 2021, Coverage Position Letter [hereinafter "Dec 2021 Letter"]).

[32] A83 (Del. Sup. Ct. Compl. at 15).

[33] A87–88 (Del. Sup. Ct. Compl. at 19–20).

[34] *Harman Int'l Indus., Inc. v. Illinois Nat'l Ins. Co.* (*Harman II*), 2025 WL 84702, at *3 (Del. Super. Jan. 7, 2025).

[35] A294–334 (Br. in Supp. of Harman's Mot. to Dismiss); A445–494 (Br. in Opp'n to Harman's Mot. to Dismiss & in Supp. of Insurer's Mot. for Summ. J.).

In January 2025, the Superior Court granted summary judgment in favor of Harman finding that Insurers did not show that the provision excludes coverage.[36] The court, in addressing the Bump-Up Provision, described it as having the following elements:

> For this Bump-Up to exclude any settlement or portion thereof: (1) the settlement must be related to an underlying acquisition; (2) inadequate deal price must be a viable remedy that was sought for at least one claim in the *Baum* Action; and (3) the settlement, or a portion of the settlement, must represent an effective increase in consideration.[37]

The Superior Court held that the Settlement was related to an underlying acquisition.[38] The court held that the Transaction, structured as a reverse triangular merger, was an acquisition as contemplated by the operative Policy language. It determined that the Transaction had the characteristics of an acquisition because "Harman retained separate legal existence, only Harman shareholders voted, and the transaction was commonly referred to, even by Harman, as an acquisition."[39]

---

[36] *Harman II*, 2025 WL 84702, at *12. It also denied the Insurers' motion for summary judgment. *Id.*

[37] *Harman II*, 2025 WL 84702, at *6. Previously, at the pleading stage, the court held that the provision applies only if the following three elements were met: "(1) the transaction must be 'an acquisition of all or substantially all of an entity's assets or ownership'; (2) the *Baum* Action settlement must be related only to the allegation of inadequate consideration; and (3) the *Baum* Action settlement must represent an effective increase in consideration." *Harman Int'l Indus., Inc. v. Illinois Nat'l Ins. Co.* (*Harman I*), 2023 WL 3055217, at *9 (Del. Super. Apr. 24, 2023) *withdrawn and superseded by Harman II*, 2025 WL 84702. However, the court restated the elements in *Harman II* after re-examining "the relevant language and the parties' cross-motion positions set out in their papers and arguments[.]" *Harman II*, 2025 WL 84702, at *6 n.68.

[38] *Id.* at *8–11.

[39] *Id.* at *9.

10

However, the Superior Court determined that the Operative Complaint did not allege inadequate consideration. It acknowledged that the "only relief sought in the *Baum* Action was 'the difference between the price Harman shareholders received and Harman's true value at the time of the Acquisition[]' [and] one might rightly read that as a request of relief for inadequate consideration."[40] Yet, the court also stated that "Insurers must establish the *Baum* Action plaintiffs requested a remedy for inadequate deal price for at least one claim, and that was a form of relief permitted for the claim alleged."[41] Therefore, the court concluded that the Operative Complaint did not allege inadequate consideration because, "[a]s only violations of Sections 14(a) and 20(a) of the Exchange Act were alleged, there [was] no claim pled where inconsiderate deal price [was] a viable remedy."[42]

The court also determined that the Settlement Amount did not represent an effective increase in deal consideration. The court observed that "for a settlement to represent an effective increase in consideration, the settlement must be for the actual purpose of 'bumping up' the value of the deal[]" and "only the amount of the settlement related to curing the deal price may be excluded from coverage under the Policy language."[43] To determine what this Settlement Amount represented, the court considered four factors: "the language of the settlement;" "indications that the settlement amount represents compensation for an inadequate deal price;" "the stage of litigation at

---

[40] *Id.*

[41] *Id.*

[42] *Id.* at *10.

[43] *Id.*

11

the time of the settlement;" and "the composition of the settlement class."[44]  The court stated that "[o]n the record developed—which the Insurers [stated was] [] adequate to resolve the issue—the Court cannot find that any part of the *Baum* Action settlement represents an amount by which the transaction price or consideration is effectively increased."[45]  Accordingly, the Superior Court held that the Bump-Up Provision did not exclude the Settlement Amount from coverage.

## II.    CONTENTIONS ON APPEAL

On appeal, Insurers argue that the Superior Court erred in determining that the Settlement Amount was covered by the Policy because the Operative Complaint alleged inadequate consideration and the Settlement Amount represented an increase in deal consideration.  First, Insurers claim that the plain and ordinary meaning of the Bump-Up Provision requires only that a Claim allege inadequate consideration and does not require a determination that the Claim be viable.  Insurers argue that this requirement was met because, in their view, there is no doubt the *Baum* Action alleged that the consideration paid to Harman shareholders was inadequate.

Second, Insurers assert that when determining whether the Settlement Amount represented an increase in deal consideration, the court must consider the overall result of the Settlement rather than whether the Settlement was for the actual purpose of increasing the deal consideration.  Insurers argue that because the Settlement expressly stated that it was meant to be a final and complete resolution of the Operative Complaint, and because

---

[44] *Id.*

[45] *Id.* at *11.

12

the sole theory of loss in the Operative Complaint was inadequate deal consideration, the Settlement Amount must represent the resolution of that loss (*i.e.*, an increase in the alleged inadequate deal consideration). Insurers also argue that the Settlement Amount represented an increase in deal consideration because the Settlement Amount was disbursed on a *pro rata*, per share basis and the Notice to Shareholders used the word "compensation" when describing what the shareholders would receive in the Settlement.[46]

In response, Harman asserts that the Superior Court correctly held that the Bump-Up Provision did not apply because the Operative Complaint did not allege inadequate consideration and the Settlement Amount did not represent an increase in deal consideration. Harman argues that "[u]nder Delaware law, for a Claim to 'allege' a particular fact or circumstance within the meaning of an insurance policy exclusion, that fact or circumstance must be meaningfully linked to the viability of the Claim faced by the policyholder and the Loss the policyholder could incur."[47] According to Harman, "[t]here was no such meaningful link here[]" because the Operative Complaint was a "Securities Claim" predicated on securities law violations that deprived shareholders "of the ability to cast an informed vote on the Transaction[.]"[48]

According to Harman, the Settlement Amount did not represent an increase in consideration because "indisputable record evidence shows that the Baum Action also

---

[46] Opening Br. 35–36 ("[T]he settlement represents 'compensation' to the class for its injury, which, according to the plaintiff and her counsel, was inadequate deal consideration.").

[47] Answering Br. on Appeal of Pl.-Below/Appellee 44 [hereinafter "Answering Br."].

[48] *Id.* at 44.

posed risks unrelated to the adequacy of the deal price[.]"[49]   Harman argues that the complete and final resolution of the Operative Complaint was not limited to resolving inadequate deal consideration because the Operative Complaint alleged compensatory and rescissory damages based on a flawed transaction process in addition to inadequate deal consideration.  Harman asserts that because the settlement class definition did not require shareholders to receive deal consideration, the composition of the settlement class also suggests that the Settlement did not represent an increase in deal consideration.

Additionally, Harman argues that the distribution method "has zero bearing on what the amounts paid actually 'represent' to shareholders[]" because shareholder class action settlements are routinely distributed on a per-share basis.[50]  Harman argues that the language of the notice shows that the "compensation" was based on the "risk-adjusted possibility of recovery after trial and any appeals" rather than inadequate deal consideration.  Accordingly, Harman argues that Insurers have not met their burden to show that both requirements were met.

Further, Harman argues that even if the Settlement Amount represented an effective increase in deal consideration, the attorneys' fees component of the Settlement Amount does not.  Harman asserts "that $8,803,809.79 of the Settlement was never paid to or controlled by recovering shareholders, such that it would make little sense to conclude that this amount represents an effective increase in their deal consideration."[51]

---

[49] *Id.* at 25.

[50] *Id.* at 27.

[51] *Id.* at 42.

### III.     STANDARD OF REVIEW

"This Court reviews a grant or denial of a motion for summary judgment *de novo*."[52]  "We review the interpretation of insurance contracts *de novo*."[53]

### IV.     ANALYSIS

"[W]hen there is a coverage dispute, '[t]he language of the policy and the allegations of the complaint must be construed together to determine the insurers' obligation.'"[54]  "Insurance contracts, like all contracts, are construed as a whole, to give effect to the intentions of the parties."[55]  "Normally, unless a contract is found to be ambiguous, a court should interpret its language as it would be understood by an objective, reasonable third party, and ascribe to it its ordinary and usual meaning."[56]  "[I]f the language is clear and unambiguous a Delaware court will not destroy or twist the words under the guise of construing them."[57]

"However, '[b]ecause an insurance policy is an adhesion contract and is not generally the result of arms-length negotiation, courts have developed rules of construction which differ from those applied to most other contracts.'"[58]  "This has led

---

[52] *In re Solera Ins. Coverage Appeals*, 240 A.3d 1121, 1130 (Del. 2020); *see also Ferrellgas Partners L.P. v. Zurich Am. Ins. Co.*, 319 A.3d 849, 865 (Del. 2024).

[53] *In re Solera*, 240 A.3d at 1130; *see also Origis USA LLC v. Great Am. Ins. Co.*, 345 A.3d 936, 951 (Del. 2025); *Ferrellgas*, 319 A.3d at 865.

[54] *Origis*, 345 A.3d at 952.

[55] *Id.* at 954 (quoting *RSUI Indem. Co. v. Murdock*, 248 A.3d 887, 905 (Del. 2021)).

[56] *Id.* at 952 (quoting *Ferrellgas*, 319 A.3d at 868).

[57] *Ferrellgas*, 319 A.3d at 868 (quoting *Hallowell v. State Farm Mut. Auto. Ins. Co.*, 443 A.2d 925, 926 (Del. 1982)).

[58] *Id.* (quoting *Hallowell*, 443 A.2d at 926).

this Court to adopt the doctrine of reasonable expectations and '[a] fundamental premise of the doctrine is that the policy will be read in accordance with the reasonable expectations of the insured so far as its language will permit.'"[59] "Courts will interpret exclusionary clauses with 'a strict and narrow construction . . . [and] give effect to such exclusionary language [only] where it is found to be specific, clear, plain, conspicuous, and not contrary to public policy.'"[60] "Generally, an insured's burden is to establish that a claim falls within the basic scope of coverage, while an insurer's burden is to establish that a claim is specifically excluded."[61]

Insurers have acknowledged that the underlying action has met the threshold requirements for coverage.[62] Therefore, the sole issue before this Court is whether Insurers have shown that the Bump-Up Provision otherwise excludes the Settlement Amount from coverage.[63]

---

[59] *Origis*, 345 A.3d at 953 (quoting *Ferrellgas*, 319 A.3d at 868); *see also RSUI Indem. Co.*, 248 A.3d at 906 ("Insurance contracts should be interpreted as providing broad coverage to align with the insured's reasonable expectations.").

[60] *RSUI Indem.*, 248 A.3d at 906 (quoting *AT&T Corp. v. Clarendon Am. Ins. Co.*, 2006 WL 1382268, at *9 (Del. Super. Apr. 13, 2006), *rev'd in part on other grounds*, *AT & T Corp. v. Faraday Cap. Ltd.*, 918 A.2d 1104 (Del. 2007)) (ellipses in original).

[61] *Id.* (quoting *AT&T Corp.*, 2006 WL 1382268, at *9).

[62] A2186 (AIG's July 20, 2017, Coverage Position Letter at 1) (accepting the Operative Complaint as a securities claim); A903 (AIG Policy § 13, at 17) ("'**Claim**' shall include any **Securities Claim**.").

[63] Insurers argue that the Superior Court erred in treating the Bump-Up Provision as an exclusion. However, they waived the argument by raising it only in a footnote in their opening brief on appeal. Del. Sup. Ct. R. 14(b)(vi)(A)(3) ("The merits of any argument that is not raised in the body of the opening brief shall be deemed waived and will not be considered by the Court on appeal."); *see* Opening Br. 15 n.5.

*A.     The Bump-Up Provision Does Not Exclude the Settlement Amount from Coverage*

The Bump-Up Provision excludes coverage of settlement amounts where the Claim underlying the settlement alleged inadequate deal consideration for an acquisition and such settlement amount represented an effective increase in deal consideration.  For convenience, we restate the relevant part of the provision:

> In the event of a **Claim** alleging that the price or consideration paid or proposed to be paid for the acquisition or completion of the acquisition of all or substantially all the ownership interest in or assets of an entity is inadequate, **Loss** with respect to such **Claim** shall not include any amount of any judgment or settlement representing the amount by which such price or consideration is effectively increased[.][64]

Determining whether the Bump-Up Provision applies requires two steps.  Under the first step, we consider whether the underlying Claim alleges inadequate deal consideration for the Transaction.  If the answer is yes, then we must determine whether the Settlement Amount, or any portion of the Settlement Amount, represented the amount by which such alleged inadequate deal consideration was effectively increased.  The Bump-Up Provision will exclude coverage of the Settlement Amount, or a portion of the Settlement Amount, if, and only if, Insurers show that both requirements have been met.

This two-step construction of the Bump-Up Provision is supported by other courts construing similar bump-up provisions.  In *Northrop Grumman Innovation Sys., Inc. v. Zurich American Ins. Co.*, the Delaware Superior Court first analyzed the allegations in the underlying claim and the type of transaction, then considered what the settlement

[64] A909 (AIG Policy § 13, at 22).

amount represented.[65]   In *Towers Watson & Co. v. National Union Fire Insurance Company of Pittsburgh, PA* (*Towers II*), the United States Court of Appeals for the Fourth Circuit similarly analyzed the claim and then the settlement amount where the bump-up "provision establishes two conditions that must be satisfied before the exclusion is triggered."[66]

However, not all bump-up provisions contain the same claim and loss requirements.   For example, the bump-up provision in *Joy Global, Inc. v. Columbia Casualty Company* effectively contained only the "first-step" of the analysis concerning Claims alleging inadequate consideration.[67]   As a result, the United States District Court

---

[65] *Northrop Grumman*, 2021 WL 347015, at *20–21.  In relevant part, the exclusion provided:

> In the event of a Claim alleging that the price or consideration paid for the acquisition or completion of the acquisition of all or substantially all the ownership interest or assets in an entity is inadequate, Loss with respect to such Claim shall not include any amount of any judgment or settlement representing the amount by which such price is effectively increased[.]

*Id.* at 19.

[66] 138 F.4th 786, 793 (4th Cir. 2025) (stating that, "[f]irst, there must be a 'Claim' alleging that the consideration paid for an acquisition was inadequate[,]" and "second, the settlement of such claim must 'represent[]' an 'effective[] increase[]' in the 'price or consideration' shareholders received for that acquisition[]"); *see also Towers Watson & Co. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA* (*Towers I* and, collectively with *Towers II*, "*Towers Watson*"), 2024 WL 993871, at *4 (E.D. Va. Mar. 6, 2024), *aff'd*, *Towers II*, 138 F.4th.  In relevant part, the exclusion provided:

> In the event of a Claim alleging that the price or consideration paid or proposed to be paid for the acquisition or completion of the acquisition of all or substantially all the ownership interest in or assets of an entity is inadequate, Loss with respect to such Claim shall not include any amount of any judgment or settlement representing the amount by which such price or consideration is effectively increased[.]

*Towers II*, 138 F.4th at 793.

[67] 555 F. Supp. 3d 589, 593 (E.D. Wisc. 2021), *aff'd*, *Komatsu Mining Corp. v. Columbia Casualty Co.*, 58 F.4th 305 (7th Cir. 2023).  In relevant part, the exclusion provided that "**Loss**

for the Eastern District of Virginia did not determine what the settlement amount at issue represented. In fact, the *Joy Global* court distinguished *Northrop Grumman* by observing that the exclusion at issue in *Northrop Grumman* "[wa]s narrower and applied only to that part of a settlement of an Inadequate Consideration Claim 'representing the amount by which such price is effectively increased.'"[68] The Bump-Up Provision here is also narrow like the provisions in *Northrop Grumman* and *Towers Watson* and requires a two-step analysis.

We hold that Insurers have met their burden under the first step to show that the Claim underlying the Settlement is a Claim alleging inadequate consideration. However, we agree with the Superior Court's determination that Insurers have not satisfied the second step requiring Insurers to show that the Settlement Amount represents an increase in the alleged inadequate consideration. Therefore, we affirm the Superior Court's holding that the Bump-Up Provision does not exclude coverage of the Settlement Amount. We next explain our reasoning.

---

(other than **Defense Costs**) shall not include: . . . any amount of any judgment or settlement of any **Inadequate Consideration Claim** other than **Defense Costs** and other than [loss incurred by directors and officers that is not indemnified by Joy Global][.]" *Id.* (ellipses in original). "Inadequate Consideration Claims are defined as[] '[t]hat part of any **Claim** alleging that the price or consideration paid or proposed to be paid for the acquisition or completion of the acquisition of all or substantially all of the ownership interest in or assets of an entity is inadequate." *Id.*

[68] *Id.* at 595. The court observed that, "[t]he provision before me does not contain such language." *Id.* (referring to the part of the exclusion that "applied only to that part of a settlement of an Inadequate Consideration Claim 'representing the amount by which such price is effectively increased[]'").

19

## 1.	The Operative Complaint is a Claim Alleging Inadequate Price

To satisfy the first step, Insurers must establish three related components: (1) a Claim, (2) an allegation that the price or consideration for a transaction was inadequate, and (3) an acquisition.[69]  The parties agree that the Operative Complaint is a Claim as defined by the Policy[70] and have not appealed the Superior Court's holding that the Transaction was an acquisition under the Policy's plain language.[71]  Thus, the sole remaining inquiry under this first step concerns the second component—an allegation of inadequate price.

The language of the Bump-Up Provision sets a low bar for this inquiry.  "Where no ambiguity exists, the contract will be interpreted according to the 'ordinary and usual meaning' of its terms."[72]  The provision states that the Claim must allege inadequate price or consideration.[73]  "Allege" is not defined in the Policy, but "[t]his Court often looks to dictionaries to ascertain a term's plain meaning" where the term is not defined in the

---

[69] *See* A909 (AIG Policy § 13, at 22).

[70] A2186 (AIG's July 20, 2017, Coverage Position Letter at 1) (accepting the Operative Complaint as a securities claim); A903 (AIG Policy § 13, at 17) ("'**Claim**' shall include any **Securities Claim**.").

[71] *Harman II*, 2025 WL 84702, at *8 (finding that "the transaction between Harman and Samsung was an acquisition under the plain language of the provision[]").

[72] *Thompson St. Cap. Partners IV, L.P. v. Sonova United States Hearing Instruments, LLC*, 340 A.3d 1151, 1166 (Del. 2025).

[73] *See* A909 (AIG Policy § 13, at 22).

contract.[74]  Merriam-Webster's Dictionary defines "allege" as "to assert without proof or before proving" or "to bring forward as a reason or excuse[.]"[75]

Harman argues that, "[u]nder Delaware law, for a Claim to 'allege' a particular fact or circumstance within the meaning of an insurance policy exclusion, that fact or circumstance must be meaningfully linked to the viability of the Claim faced by the policyholder and the Loss the policyholder could incur."[76]  However, Harman's argument relies on *ACE American Insurance Company v. Guaranteed Rate, Inc.*, where the relevant insurance contract language was "arising out of" rather than "allege."[77]  In that case, this Court determined "whether the FCA [False Claims Act] claims *arose out* of GRI's loan originating and underwriting services."[78]  Because the Policy at issue here uses "allege" rather than "arising out of," the "meaningful linkage" standard discussed in *ACE American Insurance Company* is not useful in determining whether the underlying Claim here alleged inadequate consideration.

The Superior Court held that "for the exclusion to apply, inadequate deal price must be a viable remedy that was sought for at least one claim in the *Baum* Action."[79]  However, we agree with Insurers that there is no language in the Policy that gives rise to

---

[74] *In re Solera*, 240 A.3d at 1132.

[75] *Allege*, Merriam-Webster's Dictionary (last accessed Jan. 7, 2026), https://www.merriamwebster.com/dictionary/allege; *see also Allege*, Cambridge Dictionary (last accessed Jan. 7, 2026), https://dictionary.cambridge.org/dictionary/english/allege (defining "allege" as "to say that someone has done something illegal or wrong without giving proof").

[76] Answering Br. 44 (citing *ACE Am. Ins. Co.*, 305 A.3d at 347).

[77] 305 A.3d at 345–47.

[78] *Id.* at 345.

[79] *Harman II*, 2025 WL 84702, at *9.

a "viability" requirement. We are not inclined to read such a requirement into the language of the Policy. Further, other courts, considering similar policy language, have found inadequate disclosure claims to allege inadequate consideration without considering a viability requirement.[80]

In *Towers I*, the United States District Court for the Eastern District of Virginia, applying Virginia law, found that the Section 14(a) claims and the fiduciary duty claims alleged inadequate consideration "[b]ecause the allegations of inadequate consideration [] were the basis for the harms underlying" both types of claims.[81] Although the Section 14(a) claim ultimately relied on material misrepresentations in a proxy statement, the federal court determined that the claim alleged inadequate consideration because the factual allegations of inadequate consideration "were intrinsic to the theory of the Section 14(a) claim."[82]

Similarly, in *Joy Global*, the relevant "suits alleged that Joy Global and its directors and officers had issued a false or misleading proxy report for the purpose of inducing shareholders to vote their shares in support of a merger agreement which secured inadequate consideration for Joy Global's shares."[83] The United States District

---

[80] *See Towers I*, 2024 WL 993871, at *4 (finding the first step satisfied by both Section 14(a) and fiduciary claims); *see also Joy Global*, 555 F. Supp. 3d at 594–95 (finding the first step satisfied by claims alleging that a proxy report was false or misleading).

[81] *Towers I*, 2024 WL 993871, at *5; *see also Komatsu Mining Corp.*, 58 F.4th at 308 (recognizing that a Section 14(a) claim alleges inadequate consideration when "the *loss* from any legal wrong depend[s] on a conclusion that the price offered in the merger was too low[,]" even though "[t]he federal claim [is] assert[ing] inadequate disclosure[]").

[82] *Towers I*, 2024 WL 993871, at *5.

[83] *Joy Global*, 555 F. Supp. 3d at 592.

Court for the Eastern District of Wisconsin, applying Wisconsin law, determined that the suits alleged inadequate consideration because "each complaint alleged that the price proposed to be paid for an acquisition transaction was inadequate" and "each cause of action within the suits relied on the allegations of inadequate consideration[.]"[84] The court held that "the settlements [were] therefore excluded from the definition of loss and [were] not covered by the insurance policies."[85] The United States Court of Appeals for the Seventh Circuit affirmed, stating that the claims alleged inadequate consideration because "the *loss* from any legal wrong depended on a conclusion that the price offered in the merger was too low."[86]

Here, the Section 14(a) claims also relied on allegations of inadequate consideration. "[T]o prevail in a private cause of action asserting a violation of Section 14(a) and Rule 14a-9, 'a plaintiff must show that (1) the proxy statement contained a material misrepresentation or omission (2) *that caused the plaintiff injury* and that (3) the proxy solicitation was an essential link in the accomplishment of the transaction.'"[87] The Operative Complaint alleged that "[t]he false and/or misleading Proxy used to obtain shareholder approval of the Acquisition" deprived the Investor Class of their right to "the full and fair value for [their] Harman shares."[88] The Operative Complaint also asserted

---

[84] *Id.* at 594.

[85] *Id.*

[86] *Komatsu Mining Corp.*, 58 F.4th at 309.

[87] *Towers I*, 2024 WL 993871, at *5 (quoting *Karp v. First Conn. Bancorp, Inc.*, 69 F.4th 223, 231 (4th Cir. 2003) (per curiam)).

[88] A609 (Operative Compl. at 48).

23

that the "actual economic losses" were comprised of "the difference between the price Harman shareholders received and Harman's true value at the time of the Acquisition."[89]

Much like the case in *Towers Watson*, allegations of inadequate consideration here were "intrinsic to the theory of the Section 14(a) claim[.]"[90] Therefore, we disagree with the Superior Court's conclusion that the first step of the Bump-Up Provision was not met.[91] However, the Bump-Up Provision applies only if both steps are satisfied, and as we explain below, the second step was not.

2.      *The Settlement Amount Does Not Represent an Effective Increase in Price or Consideration for the Transaction*

We next determine whether the Settlement Amount, or any portion of the Settlement Amount, is the excluded type of Loss. The Bump-Up Provision excludes Loss, with respect to a Claim alleging inadequate consideration, "representing the amount by which such price or consideration is effectively increased."[92] The provision does not define "represent" or "effectively," but as we previously stated, "[t]his Court often looks

---

[89] *Id.*

[90] *Towers I*, 2024 WL 993871, at *5.

[91] We note that in *Northrop Grumman*, the Delaware Superior Court found that a 14(a) Claim did not allege inadequate consideration where the claim alleged that "a materially false and misleading Joint Proxy Statement[]" "not only coerced the Orbital Sciences stockholders to 'accept inadequate consideration' but also 'induc[ed] them to vote their shares' when they otherwise wouldn't have." *Northrop Grumman*, 2021 WL 347015, at *20 (noting that "'inadequate consideration' alone would not sustain a 14(a) suit"). The court determined that the requirement would be met only if the relevant claim exclusively alleged inadequate consideration even though "only" is not included in the language of the policy. *See id.* at *19–20; *see also Joy Global*, 555 F. Supp. 3d at 595 (stating that the Delaware Superior Court "read the relevant exclusion as limited to a claim alleging 'only' that inadequate consideration was paid for an acquisition, despite the word 'only' not appearing in the provision"). Leaving aside the Superior Court's holding in *Northrop Grumman*, we do not find that any language in this Bump-Up Provision requires inadequate consideration to be the exclusive allegation.

[92] A909 (AIG Policy § 13, at 22).

to dictionaries to ascertain a term's plain meaning."[93]  "Represent" is defined as "to constitute or amount to,"[94] or "to serve as a sign or symbol of."[95]  "Effectively" is defined as "in effect: virtually[,]"[96] "in a way that is successful and achieves what you want[,]" and "used when you describe what the real result of a situation is[.]"[97]  Accordingly, the second step will be satisfied only if Insurers can show that the "real result" of the Settlement is that the Settlement Amount, or any portion of the Settlement Amount, increased the amount of deal consideration the shareholders received in the Transaction.

In *Northrop Grumman*, Alliant and Orbital Sciences "proposed a reverse triangular stock-for-stock merger out of which OATK would be born" and "[t]heir stockholders received proxy forms and other disclosures and ultimately approved" the transaction.[98] After the transaction closed, a class of OATK stockholders who formerly owned Orbital Sciences stock, asserted a Section 14(a) claim that "alleged wrongdoing pertaining to pre-merger proxy solicitation misstatements about Alliant and Orbital Sciences' synergies that were calculated to coerce stockholder approval of a transaction saddled with low-return

---

[93] *In re Solera*, 240 A.3d at 1132.

[94] *Represent*, Black's Law Dictionary (12th ed. 2024).

[95] *Represent*, Merriam-Webster's Dictionary (last accessed Jan. 7, 2026) https://www.merriam-webster.com/dictionary/represent.

[96] *Effectively*, Merriam-Webster's Dictionary (last accessed Jan. 7, 2026) https://www.merriam-webster.com/dictionary/effectively.

[97] *Effectively*, Cambridge dictionary (last accessed Jan. 7, 2026) https://dictionary.cambridge.org/us/dictionary/english/effectively.

[98] *Northrop Grumman*, 2021 WL 347015, at *4.

prospects."[99] The parties eventually settled the 14(a) claim for $45.6 million and "[n]o defendant admitted wrongdoing."[100]

The Delaware Superior Court found that the settlement did not satisfy the second requirement of the bump-up provision because "the Alliant Insurers can't show that the *Knurr* settlement 'represent[s]' an 'effective increase' of whatever 'inadequate consideration' the Orbital Sciences stockholders bemoaned."[101] The trial court determined that the underlying claim was not "solely about an unfair equity exchange" because the "stockholders didn't seek an appraisal to 'effectively increase[]' their stake or its value."[102] Instead, the stockholders "sought unelaborated 'compensatory damages' for the 'overvalued' Alliant-turned-OATK stock extracted through falsified proxy forms to effectively *decrease* what they 'paid.'"[103] The court noted that "if the *Knurr* settlement—which admitted no wrongdoing—'represent[s]' anything at all, then it represents a 'bump down'—not a 'bump up.'"[104] Accordingly, the Delaware Superior Court determined that

---

[99] *Id.* at *11. We note, regarding the reverse triangular stock-for-stock merger at issue, that the Orbital Sciences stockholders alleged that they were coerced into voting based on an overvaluation of the consideration to be received in the relevant transaction (*i.e.*, value of the Alliant stock) while the Investor Class here alleged that it was coerced into voting based on an undervaluation of the entity being sold. In each case, the misrepresentations were alleged to impact the valuation of an entity involved in the relevant transaction. The Orbital Sciences stockholders argued that a correction of the relevant misrepresentation would require a downward adjustment of the overvalued stock while the Investor Class argued that a correction of the relevant misrepresentation would require an upward adjustment of the purchase price.

[100] *Northrop Grumman*, 2021 WL 347015, at *5.

[101] *Id.* at *22.

[102] *Id.*

[103] *Id.*

[104] *Id.*

the bump-up provision did not apply "as a matter of law[]" and that the settlement amount was not excluded.[105]

However, in *Towers II*, the United States Court of Appeals for the Fourth Circuit determined that a settlement amount represented an increase in deal consideration even where one of the underlying claims alleged harm based on inadequate disclosures.[106] The actions "asserted federal securities law claims and Delaware state law claims" which "stemmed from allegations that [CEO John] Haley negotiated [a] Merger Agreement under an undisclosed conflict of interest: he would receive a compensation package worth up to $165 million if the deal closed."[107] "And because of this alleged conflict, Haley purportedly agreed to a below-market valuation of Towers Watson shares to ensure the merger's success."[108] The shareholders presented an expert report which was designed to calculate their loss *i.e.*, "the 'true' value of their shares, minus the actual consideration they received."[109] The underlying actions "ultimately settled for a total of $90 million[,]" and in *Towers II*, the Fourth Circuit held that the district court had not

---

[105] *Id.* As previously discussed, the *Northrop Grumman* court also found that the first requirement was not met because the claims did not exclusively allege inadequate consideration. However, the court analyzed the second requirement even after it found that the first requirement was not met.

[106] *Towers II*, 138 F.4th at 790, 796 (The relevant actions "asserted federal securities law claims and Delaware state law claims[.]"); *see also Towers I*, 2024 WL 993871, at *1 (The federal action was "an action alleging a violation of the proxy solicitation rules under Sections 14(a) and 20(a) of the Securities Exchange Act of 1934[.]")

[107] *Towers II*, 138 F.4th at 790.

[108] *Id.*

[109] *Id.* at 795.

erred in holding that the bump-up provision excluded that entire amount from coverage.[110]

The Fourth Circuit agreed with the district court that the second step of the analysis centered on "whether, at the end of the day, the former Towers Watson shareholders were paid additional monies because the amount they received in the merger was inadequate."[111] The Fourth Circuit broadly considered "the shareholders' allegations, the purpose of the expert report, and most importantly, the practical effect of the damages: to compensate shareholders for the purportedly inadequate consideration they received for the acquisition of their shares."[112] The Fourth Circuit stated that it "ha[d] little trouble concluding that the bump-up exclusion's second condition [was] satisfied" because "the 'real result' of the settlements [was] that the shareholders receive[d] additional consideration for their relinquished shares[.]"[113]

---

[110] *Id.* at 790, 796.

[111] *Id.* at 791 (quoting *Towers I*, 2024 WL 993871, at *8). Our dissenting colleagues state that they would follow the Fourth Circuit's reasoning in *Towers II*. They conclude that the second requirement is similarly met here because the Settlement Amount was paid to settle the Operative Complaint which sought damages representing "the difference between the price Harman shareholders received and Harman's true value at the time of the Acquisition [] in an amount to be determined at trial." A609 (Operative Compl. at 48). However, as the Fourth Circuit made clear, courts cannot collapse the two steps of analysis by "looking only at the allegations and not what the settlement itself represented." *Towers II*, 138 F.4th at 794. Rather, these are "distinct issues." *Id.*

[112] *Id.* at 795.

[113] *Id.* at 793–94. Insurers assert that "*Joy Global* reached the same conclusion." Opening Br. 34. However, as we previously noted, the bump-up provision in *Joy Global* applied broadly to "any amount of any judgment or settlement of any" claim alleging inadequate consideration rather than just the amount representing an increase in inadequate consideration. *Joy Global*, 555 F. Supp. 3d at 593. In affirming the district court, the Seventh Circuit observed that "the language of the exclusion in *Northrop Grumman* differs from the definition of 'inadequate consideration' in Joy Global's policies." *Komatsu Mining Corp.*, 58 F.4th at 309. It added that,

28

The Insurers here argue that this Settlement Amount similarly represented an increase in deal consideration. However, we agree with the Superior Court's determination, made after considering the evidentiary record, that Insurers have not met their burden to show that any portion of this Settlement Amount satisfies the second requirement of this Bump-Up Provision.

First, the composition of the settlement class was not limited to shareholders who received consideration in connection with the Transaction. It appears to us, based on the briefing in *Towers II*, that the class definition for the settlements resolving the inadequate disclosures claims in *Towers Watson* limited the class to shareholders who received consideration in connection with the acquisition of their shares.[114] Although the *Towers II* court did not explicitly base its holding on the definition of the class, it noted that "the practical effect of the damages [was] to compensate shareholders for the purportedly inadequate consideration they received for the acquisition of their shares."[115] This "practical effect" seems to assume that every shareholder who received a *pro rata* portion

---

"Komatsu Mining wants us to proceed as if all D&O policies contain the same language, but they don't, so we shouldn't." *Id.* Because the bump-up provision in *Joy Global* did not require a second step of analysis, *Joy Global* is irrelevant in determining what this Settlement represents.

[114] *See, e.g.*, Appellants' Opening Brief at 18, *Towers II*, 138 F.4th (No. 21-2396). The settlement resolving the inadequate disclosures claim required all class members to have held their shares "starting October 1, 2015 (the record date when shareholders could vote on the merger) through January 4, 2016 (when the transaction closed)." *Id.* The settlement resolving the state law claims included all shareholders who held "shares at any time between June 29, 2015 (the date of the Agreement and Plan of Merger) and January 4, 2016 (when the transaction closed)." *Id.*

[115] *Towers II*, 138 F.4th at 795.

of the settlement amount also received consideration in connection with the underlying transaction.[116]

Here, the settlement class definition included all Harman shareholders who held stock "*at any time* during the period from" the date of the shareholder vote approving the Transaction to the Transaction's closing date.[117] This definition did not require class members to hold stock through the Transaction's closing date. Thus, it included shareholders who may have sold their shares before the Transaction closed. That is an important distinction from the settlement in *Towers II*. In *Towers II*, the Fourth Circuit, applying dictionary definitions of "represent" and "effectively," explained that "if the 'real result' of the settlements is that the shareholders receive[d] additional consideration for their relinquished shares, this condition is satisfied."[118] In our case, the record does not indicate that all settlement class members relinquished shares in the Transaction and received Transaction consideration which could be increased.

Second, the *Towers II* record contained an expert report which was designed to calculate the shareholders' loss *i.e.*, "the 'true' value of their shares, minus the actual

---

[116] *See also Ceradyne, Inc. v. RLI Ins. Co.*, 2022 WL 16735360, at *11 (C.D. Cal. Oct. 31, 2022) (finding that "the undisputed evidence indicates that the entire settlement was intended to, and in actuality did, increase the consideration paid to shareholders in relation to Ceradyne's acquisition" where "the Stipulation of Settlement defined the 'Class' as those 'who rec[e]ived consideration for their shares in the sale . . . at the price of $35.00 per share[]'"), *appeal dismissed per stipulation*, 2023 WL 2340646 (9th Cir. Feb. 7, 2023).

[117] A710 (Stipulation of Settlement at 6) (emphasis added); A731 (Stipulation of Settlement at 27). The Notice to Shareholders states that the Settlement Class was designed to "align[] the recovery with those who have legal standing to bring the claims currently asserted in the Litigation[]" (*i.e.*, those who were "holders of record entitled to vote on the Merger"). A761 (Notice to S'holders at 9). However, we note that this does not align with the class definition included in the Settlement.

[118] *Towers II*, 138 F.4th at 793.

30

consideration they received."[119] The Fourth Circuit relied on the purpose of that expert report when it held that the $90 million settlement amount represented an increase in inadequate deal consideration.[120]

It is true that the Operative Complaint sought to quantify the damages by calculating "the difference between the price Harman shareholders received and Harman's true value at the time of the Acquisition [] in an amount to be determined at trial."[121] But as the Superior Court noted, "[a]t the time of the settlement, the *Baum* Action was still in the early stages of litigation with only minimal discovery completed."[122] The record before us indicates that the parties settled before either party presented any evidence, such as an expert report, relating to the true value of the shares. And the Insurers did not present any evidence that the Settlement Amount was in any way arrived at or calculated based on how much the recovering class members should or could have received in the Transaction.

As the Superior Court observed, "if the parties intended for the settlement to represent compensation for an inadequate deal price, then one would expect that the settlement amount would have been in some way commensurate with the difference

---

[119] *Id.* at 795.

[120] *Id.* In fact, the Fourth Circuit cited to an exhibit reflecting an "analysis from the Virginia plaintiffs' damages expert 'estimat[ing] damages as the minimum incremental amount that Towers [Watson] shareholders should have expected to obtain or retain based on a full disclosure of the information that Lead Plaintiff argues should have been disclosed[.]'" *Id.* at 794.

[121] A609 (Operative Compl. at 48).

[122] *Harman II*, 2025 WL 84702, at *11.

between the shares' acquisition price of $112 and their true value."[123]   It concluded that the Settlement Amount was not.  It also noted that there has "been no evidence presented on the true value of the shares[]" and stated that "the Court shouldn't be left to speculate thereon[.]"[124]

Rather, it seems more likely, as the Superior Court concluded, that the Settlement Amount was based upon the cost of continuing the litigation.  Harman claimed that the estimated defense costs for continuing the litigation would have been about $25 to $30 million.[125]   The Superior Court found that there is "ample [] evidence that the full settlement amount [$28 million] truly represents the actual cost of litigation had the case proceeded."[126]  For example, the Settlement itself states that the parties' decision to settle "was based solely on the conclusion that further conduct of the Litigation would be protracted and expensive" and "that it would be beneficial to avoid [the] costs,

---

[123] *Id.*

[124] *Id.*   The Superior Court observed that "the settlement amount seems grossly inadequate as compensation for an inadequate deal price."  *Id.*; A606 (Operative Complaint ¶ 110).  "There were 69,883,605 shares of Harman common stock."  *Harman II*, 2025 WL 84702, at *11; A566–67, 590, 596 (Operative Complaint ¶¶ 13, 16, 70, 83).  The Operative Complaint seems to "allege that the true value was $116 per share."  *Harman II*, 2025 WL 84702, at *11; *see also* Opening Br. 8.  Therefore, the total damages amount based on the difference in the actual value versus the deal value ($116 compared to $112) would amount to $279,534,420.

[125] A5572 (Taigman Dep. at 31).

Q:  What did the [$]25 to $30 million represent?

A:  It was the estimate of the cost were we to have to move forward with the case through trial, discovery—which had really not started—and a potential appeal, although really focusing on discovery and trial.

*Id.*

[126] *Harman II*, 2025 WL 84702, at *11.

32

uncertainty, and risks inherent to any litigation, especially in complex cases like this Litigation."[127] Additionally, the Superior Court found that "[a]voiding the cost of further litigation is a valid reason to settle and the Court has no reason to believe this reasoning was pretextual."[128]

Based on the Superior Court's consideration of the record evidence, we hold that the court did not err in determining that the Insurers did not meet their burden to show that the Settlement Amount represented an increase in deal consideration. Accordingly, the second requirement was not met, and the Bump-Up Provision does not exclude coverage.

Because we hold that the Bump-Up Provision does not apply, we do not need to reach Harman's argument regarding attorneys' fees.

## V.    CONCLUSION

For the reasons discussed above, we **AFFIRM** the ruling of the Superior Court.

---

[127] A708–09 (Stipulation of Settlement at 4–5). We acknowledge that reliance upon settlement language alone may be ill-advised because "the settlement process can leave insurers on the outside and potentially be collusive." *In re CVS Opioid Ins. Litig.*, 2025 WL 2383644, at *13 (Del. Aug. 18, 2025) (noting that "settlement agreement language is not a reliable coverage indicator because" relying on settlement agreement language alone "would encourage litigants to manipulate settlement language to secure [] insurance coverage where it would otherwise not exist.").

[128] *Harman II*, 2025 WL 84702, at *11.

**SEITZ**, Chief Justice; and **TRAYNOR**, Justice, Dissenting.

We agree with the Majority's thorough analysis and conclusion that the Insurers met their burden to show that the Claim underlying the Settlement is a Claim alleging inadequate consideration. The Operative Complaint alleged a Claim for inadequate deal price. We differ, however, with the Majority's conclusion that the Settlement Amount did not represent an effective increase in price or consideration for the Transaction.

When a complaint alleges a Claim for inadequate consideration, the Policy with its Bump-Up Provision does not cover a Loss "representing the amount by which such price or consideration is effectively increased."[1] Here, the Operative Complaint sought damages representing "the difference between the price Harman shareholders received and Harman's true value at the time of the Acquisition [] in an amount to be determined at trial."[2] The Majority looked to dictionary definitions to interpret the words "representing" and "effectively." We see no reason to do so. The plain meaning of those words is evident when read in the context of the Bump-Up Provision. Without those words, the Bump-Up Provision covers the easy cases, such as an increase in the deal price to settle appraisal litigation. The two modifiers were added, however, to avoid an overly narrow interpretation of the Provision that elevates form over substance. With those words, the Bump-Up Provision makes clear that the court should look to the practical effect of the Settlement Payment and not to its form.

---

[1] A909 (AIG Policy § 13, at 22).
[2] A609 (Operative Compl. at 48).

We would follow the Fourth Circuit's reasoning in *Towers Watson & Co. v. National Union Fire Insurance Company of Pittsburgh, PA* ("*Towers II*").[3] *Towers II* involved a comparable bump-up provision that denied coverage when the settlement amount in the underlying litigation represents the amount by which the price or consideration paid for the merger was effectively increased.[4] The court in *Towers II* had "little trouble" concluding that the increase in consideration condition was satisfied when Towers Watson paid $90 million to settle stockholder suits alleging that negotiator conflicts caused the board to sell the company for less than it was worth.[5]

According to the court, when "represent" and "effectively increased" are "read together," the court looks to the "*real* result of [the] situation" – "not the theoretical one."[6] If the "'real result' of the settlement is that the shareholders receive additional consideration for their relinquished shares, this condition is satisfied."[7] The court found that to be the case. We would find that to be the case here.

The Majority attempts to distinguish *Towers II* on two grounds: first, in *Towers II*, the settlement class consisted of stockholders who held their stock through the Transaction's closing date whereas "the composition of the settlement class [in this case] was not limited to shareholders who received consideration in connection with the Transaction;" and second, unlike this case, "the *Towers II* record contained an expert

---

[3] 138 F.4th 786, 793 (4th Cir. 2025).
[4] *Id*. at 792.
[5] *Id.* at 793-95.
[6] *Id.* at 793.
[7] *Id.* at 794.

report which was designed to calculate the shareholders' loss," which used "the 'true' value of their shares, minus the consideration they received."[8]

For the first issue, we agree with the Majority that the record is unclear about how many shareholders in the class might have sold their shares prior to closing. But the Bump-Up Provision does not restrict to whom the additional consideration is paid. We are confident that at least some of the class held their shares through closing and received their *pro rata* portion of the Settlement Consideration – effectively increasing the consideration they received for the Transaction.

The second issue exposes the difficulties a court faces when required to discern the subjective intent of the parties instead of deciding the "real result" of the transaction. Litigants settle cases for any number of reasons. As the Majority recognizes, settlement agreements can be collusive between the Insured and plaintiffs.[9] In our view, it would be far simpler and more efficient if the court limited its review to the "real effect" of the settlement rather than plumb the depths after an evidentiary proceeding in search of the true motivations of the settling parties. We respectfully dissent.[10]

---

[8] Majority Op. at 29-30.

[9] *Id.* at 33 n.127 (quoting *In re CVS Opioid Ins. Litig*., 2025 WL 2383644, at *13 (Del. Aug. 18, 2025).

[10] We also agree with *Towers II* that attorney's fees paid as part of the settlement were subject to the Bump-Up Provision. As the Fourth Circuit held, it did not matter how the consideration was distributed once paid out because "it nevertheless constitute[d] *in toto* an increase in consideration paid for the merger." *Towers II*, 138 F.4th at 796-97.

36